## Clancey J. Dempster *et al.*

### v.

### Charles West.

1. Promissory note—*striking out assignment, and its effect.* The holder of a promissory note by assignment may, by agreement of the assignor, strike out the assignment, and thus re-invest the assignor with the legal title, without reference to the equitable interest.

2. Mortgage—*who may execute power of sale.* Where a mortgage given to secure the payment of a note gives the mortgagee or his assigns power to make sale of the mortgaged premises, and his assignee of the note, with his consent, strikes out the assignment of the same, the power will be restored to the mortgagee to make sale of the premises, and can not be exercised by the assignee without a new assignment.

3. Fiduciary—*prohibited in equity from purchasing at his own sale.* It is a rule of equity, that no person who is intrusted with the power to sell or dispose of trust property can become a purchaser at his own sale, even though he employs another to conduct the formal part of the sale.

4. A sheriff, master, marshal, constable, or other officer empowered by law to sell the property of another, can not become the purchaser at such sale, whether made by themselves, their deputies or criers.

5. Sale under power in mortgage—*beneficial owner of debt secured may purchase at sale made by party holding the legal title.* Where a sale is made of mortgaged property under a power of sale in the mortgage, the equitable owner of the debt secured may become the purchaser, the same as if the sale was made by an officer of the law under decree or judgment and execution.

6. Sales—*officer or trustee making must act with fairness and impartiality.* An officer or trustee, in making a sale of property, must act with the utmost good faith, with fairness and impartiality. If the purchaser is shown to have exercised undue influence over the officer or trustee, and the price is inadequate, the sale may be avoided in equity, but it is not void.

7. SALE UNDER POWER—*no unfairness, fraud or illegality presumed.*
When mortgaged property is sold by the person invested with the power
to sell, in the absence of proof to the contrary, it will not be presumed
that the purchaser exercised any undue control over the person selling,
but the sale will be sustained.

8. SAME—*sale held good and not fraudulent.* Where the mortgagee, in
a mortgage giving him and his assigns a power of sale in default of pay-
ment of principal or interest, assigned the note secured, and the assignee,
six months before the sale, notified the mortgagor that he must sell unless
the interest was paid, and failing to obtain payment elected to declare the
whole debt due, as he was authorized by the mortgage, and by an arrange-
ment with the mortgagee struck out the assignment of the note, and had
the latter proceed to sell the mortgaged premises, and bought in the same
for the amount of the note, which sum, with another mortgage to which
the property was subject, was near the value of the same, it was *held*, on
bill by the mortgagor to set aside the sale and for redemption, that the
facts did not indicate any unlawful scheme or combination between the
assignee and the mortgagee to fraudulently cut off the rights of the mort-
gagor, and that the latter was not entitled to relief against the sale, in
equity.

9. PAYMENT—*assignment of claim on third party, whether a payment.*
Where a debtor transferred a suspended claim on a bank to his creditor,
at his own instance, and long after the transfer admitted in his letters that
the interest it was intended to pay was due, and it did not appear that it
was accepted as a payment of the interest, it was *held*, that it could not be
regarded as a payment, except in the event it should be collected, but was
a collateral security only.

10. LACHES—*as a defense to equitable relief.* After a delay of seven
years from the sale of land under a power in a mortgage, the mortgagor
will be cut off in equity from avoiding the sale for mere irregularities, in
the absence of fraud, or any equitable excuse for the delay.

11. AGENCY—*receiving bids and reporting does not create an agency.* An
authority to one to receive bids for property, and report the same to the
owner for his acceptance or rejection, does not create an agency, so as to
prevent such party from exercising a power of sale in default of payment
of the purchase money.

APPEAL from the Superior Court of Cook county; the
Hon. WILLIAM A. PORTER, Judge, presiding.

This was a bill in chancery, by Charles West against Clan-
cey J. Dempster and others, to set aside the sale of certain
mortgaged premises, made under a power contained in a
mortgage, and for redemption, etc.

The opinion of the court gives a statement of the leading and material facts of the case. The defendants, Clancey J. Dempster and John H. Kedzie, appealed.

Messrs. GOUDY & CHANDLER, and Mr. ANDREW J. BROWN, for the appellants.

Mr. W. H. STANDISH, and Messrs. AYER & KALES, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

In the month of August, 1859, appellee purchased of John H. Kedzie the tract of land in controversy. The nominal price was $34,095, of which $18,000 was paid in lands in Gallatin and Johnson counties, in this State, and which were sold by Kedzie for $800. This left $16,095. For the residue appellee gave one note for $13,638, payable to Kedzie, and the balance, $2547, was to be paid to Carr, for commissions. These notes were secured by a mortgage on the premises.

In September, 1860, appellee paid Kedzie $818.28, to be applied on the principal of the notes. Soon after this, Kedzie, learning that appellee was involved, and being himself pressed for money, proposed to take, in satisfaction of his debt, $7500 in cash, and it was arranged that appellee should raise $2500 from his own means and raise $5000 by mortgaging the land. Appellee came to Chicago, but brought only $1000 in money, which he paid Kedzie, and executed a note and mortgage to Elizabeth A. Turney, upon which to raise the $5000, and gave his note to Kedzie for $1500, the balance of the money to be paid under this new arrangement.

Kedzie, however, failed to raise the $5000 from Miss Turney, and had to retain this first mortgage himself. The $1500 note was to become due at the end of five years, with interest payable semi-annually. Kedzie, on the execution of these notes and mortgages for $6500, released appellee from the balance of his indebtedness. In February, 1861, he took an

assignment of the note payable to Miss Turney to himself, and in the following April sold both notes to John Dempster, the father of one of the appellants, and received property therefor now proved to be worth from $50,000 to $70,000. On selling these notes, Kedzie retained the coupon for the first six months' interest, which appellee paid, and is all he ever paid on these last notes, and he never paid Dempster anything on them.

After some correspondence between Dempster and appellee, the former wrote the latter, Jan. 3, 1862, that the interest, then several months due, must be paid; and on the 16th of the same month he again wrote that he found it difficult to obtain money sufficient to pay taxes, and interest on $15,000 borrowed money; that he saw no possible way but to sell the land for what it would bring; "painful as this would be to me, because of the sacrifice it would be to you, I know of no other method of securing myself from sacrifice." On the 25th appellee replied: "Had I been let alone, and allowed time and opportunity to have turned my property, I might have saved something; but, as it is, I suppose I shall have to give up the ship. I had hoped to save my Chicago house and 68 or 69 acres. * * * I have no money, nor can I say when I shall have."

This closed the correspondence, but Dempster waited until in October following, and hearing nothing further from appellee, on the 31st of that month, two installments of interest being due, Dempster elected, under the terms of the note, to treat principal and interest as due, and had the land sold under the $1500 note and mortgage.

The sale was made by Kedzie, and, to enable him to do so, the name of Kedzie was erased from the back of the note, by agreement between Dempster and Kedzie, in order that Kedzie might sell and Dempster become the purchaser. At the sale Dempster became the purchaser, at $1500, and Kedzie made him a deed. After the sale, appellee did nothing for nearly seven years, when, in 1869, he instituted this suit to set aside the sale and to be let in to redeem. In the mean-

time, the West Side Park was located in the immediate vicinity, and produced an immense increase in the value of this property, which is shown now to be worth about $150,000.

The principal ground of relief relied on in the bill is, that the sale is voidable, because Dempster, still holding the debt, had the assignment of the note stricken out, to enable Kedzie to sell and he to purchase—that a person thus situated can not become a purchaser; and the court below took this view of the case, set aside the sale, and decreed a redemption. To reverse that decree, appellants bring the case to this court, and assign various errors.

The doctrine is, and can not be controverted, that when a party holds a promissory note by assignment, he and the assignor may, by agreement, strike out the assignment, and, by so doing, the legal title to the note, without reference to the equitable interest, will thus be restored or returned to the assignor. By erasing the indorsement, the legal title reinvests in the assignor, as effectually as if it had been re-indorsed to him.

Whilst the mere delivery of a note, on its sale, to the purchaser passes the equitable title to the instrument, still the legal title remains in the payee, if not indorsed, and if so, then in the last indorsee. The equitable title passes by delivery, but the legal title only by assignment, or its equivalent; and the striking out of an assignment is the equivalent of an indorsement to the next previous indorsee. It, then, follows, that when Kedzie's name on the note was erased, the legal title was vested in him for the use of Dempster, who, under the arrangement, was still entitled to all that might be realized on the note and mortgage.

We are at a loss to perceive how or for what reason Kedzie, after the title to this note became re-invested in him, was not empowered to legally make the sale and conveyance under the power in the mortgage. He, as we have seen, was fully invested with the legal title to the note; and appellee, when he made the mortgage, gave to him or to his assigns full

power to conduct the sale, and to convey the premises to the purchaser. He held the power, and transferred it to Dempster by assigning the note to him, but he not having exercised the power, it was restored to Kedzie by striking out the assignment of the note. Kedzie was selected and intrusted by appellee, either to make the sale himself, if he chose, or to transfer the power to any person to whom he might indorse the note; and if, in the course of business, the note had been put into circulation, and been again returned regularly to Kedzie through the channels of business, either as indorsee or by having to take it up under his assignment, we presume no one would have doubted his power to sell and convey.

In what would such a case as that differ from this, so far as it involves the exercise of the power? The power was coupled with an interest, and was irrevocable. It would continue until the debt was extinguished or the power was exercised. If Kedzie could not exercise the power, who could? By striking out the indorsement and vesting the legal title to the note in Kedzie, Dempster divested himself of all power to sell. Had Kedzie again indorsed the note, would or could it be contended that such new assignee could not exercise the power? We think not. Then, if he could again transfer the power to another, what could prevent him from exercising it before such transfer? How could he confer power he himself did not possess? We, as a question of naked legal power, have no hesitation in saying that he was fully invested with it, and might legally make the sale under the authority conferred by the mortgage.

This brings us to the vital question in the case, and that is, whether Dempster, who was unable to become a purchaser whilst he held the legal title to the debt, by simply transferring the legal title to Kedzie, without consideration, and still retaining the equitable title to the proceeds, became reinvested with the power to purchase the mortgaged premises. It is a rule of equity, that no person, who is intrusted with the power to sell or dispose of trust property, can become

a purchaser at his own sale; nor can he employ an agent, clerk or crier to go through with the formal parts of the sale, so that he can become legally a purchaser of the fund or property; nor can a sheriff, master, marshal, constable or other officer whom the law requires to sell and divest the owner of property of his title, become a purchaser at such sale, whether made by themselves, their deputies or criers. The law will not permit men to act under such temptation to yield to fraud and oppression. In such cases, the sales are under the entire control of the officer, and he has but to will it, and the property may be sacrificed, the owner wronged and oppressed, and if the officer were the purchaser, the owner's interest would be sacrificed to the profit of the officer. These are the considerations which render all such sales voidable.

But, in this case, the power was in and exercised by one person, and the beneficial interest in the proceeds was in another person. The judgment creditor may well become a purchaser at a sheriff's, master's, marshal's or constable's sale, under an execution or decree in his favor. No one questions this, and it is permitted because the officer exercises the power, and the creditor but becomes the purchaser by enhancing the price of the property sold, without any power to depress it. He only becomes the purchaser on bidding more than any other person. He has no control over the officer exercising the power. And it is to prevent the abuse of the power that the law will not permit an officer or a trustee to become a purchaser at his own sale. But where the purchaser can not control the exercise of the power, then the reason of the rule does not apply.

Cases may arise where the purchaser exercises an undue influence over the officer or person making the sale; and whilst such sales are not void, they may be avoided. The officer or trustee must act in the utmost good faith, with fairness and impartiality. They are, in all cases and under all circumstances, indispensable prerequisites to a valid and binding sale; and where there is power, and such a sale is

made to a stranger or a person not incapacitated to purchase, the law will rarely interpose, and then only for inadequacy of price, or to relieve against accident or mistake.

Here, Kedzie had ample power to sell, and Dempster had no greater power over him to control the sale than has the creditor over the officer to control the sale. We must presume that appellee considered Kedzie in all respects a person suited to be intrusted with the exercise of the power, as he seems to have freely conferred it upon him. Had he not, we may fairly presume he would have withheld it, and conferred it upon another. We must therefore conclude that he was fitted and properly qualified to exercise the power, and, being so, we must suppose he was not under the control or influence of Dempster, any more than would have been a sheriff or other such officer. And Dempster not having made the sale, and, so far as this record shows, in nowise having controlled it, or exercised undue influence over Kedzie, no reason is perceived why the sale was not in every particular valid and binding. He had no more interest in the debt or control over Kedzie in making the sale than has the creditor in a decree or judgment over the officer of the law in making a sale. Had Dempster filed a bill and obtained a decree ordering the master to sell, his power to purchase would not be questioned. In that case, the sale would have been made by a person upon whom the law had imposed the power, whilst in this case the sale was made by the person selected and intrusted with the power by appellee himself. And no fraud or illegality being shown in his exercising the power, or in Dempster making the purchase, the power must be held to have been well exercised, and the sale legally made, and it must be upheld.

It is unlike a sale made by Dempster whilst he held the legal title to the debt, whether by himself or his agent, and he becoming the purchaser, as then he would have had the entire control of the sale, or could at least have limited the power of his agent, so as to have purchased on his own terms,

So far as we can see, and nothing appearing to the contrary, we will presume the sale was conducted fairly and impartially, as it was made by the person selected, and upon whom appellee originally conferred the power.

This case is entirely unlike one in which the person selling becomes the purchaser. In this, the previous cases in this court are entirely distinguishable from the one under consideration. Nor can we infer from the facts disclosed in this record that there was an unlawful scheme or combination between Dempster and Kedzie to fraudulently or illegally cut off the rights of appellee. Dempster had, six months before the sale, notified him that he must sell his property unless the interest should be paid, and appellee answered he had no money and did not know when he would have. It was but natural that Dempster, who was himself pressed for money, should be importunate and desirous of collecting his claim, and it is no indication of fraud that he should, after waiting such a length of time, expose the property to sale, and become its purchaser. In this there seems to be nothing out of the usual course of business. When we consider that the property was also under another mortgage, for which it was liable to the amount of over $5000, we can not, from the evidence in the record, say that the property was sold at a sacrifice. Hence no fraud can be inferred from the price bid, and for which the conveyance was made.

It is, however, said that the whole indebtedness was declared to be due because of the non-payment of interest, when appellee may have supposed it was paid. It is true that he transferred to Dempster a suspended claim on a banker in Cincinnati for some $700, but nothing was realized on it in October, 1869, or until after this bill was filed, and from which Dempster or his representatives never received anything.

Appellee could not be supposed to have believed that any portion of this claim was paid, as he shows himself, by his letters, to have known that the banker was insolvent. He had no right to believe that money could be collected on such

a claim.    Again, he admits in his letters of January, 1862, months after he transferred this claim to Dempster, that the interest was due.    The transfer was made at his request, and he did not propose it as a payment, nor did Dempster accept it as such.    It could only have been intended by the parties as collateral security, to be applied as it should be collected, if in time to be available, towards discharging the accruing interest on Dempster's claim.

From the whole case, we have no hesitation in believing that appellee, after writing, in January, 1862, that he had no money, and did not know when he would have, abandoned all hope of preserving the property, and expected it to be sold, and had ceased to struggle to redeem it.    He seems, from that time forward, to have abandoned it to its fate.    He did not look after or pay any taxes on it.    He paid no attention to renting it, or otherwise looking after or caring for the property.    He paid neither interest nor principal on the debt, and all this, too, for almost seven years.    To our minds it is manifest that he felt that he was insolvent, and that it was useless to struggle to save this property, and had abandoned it; otherwise he would assuredly have given it some of his attention during that long period.    In fact, we can not suppose that application would ever have been made to redeem, had it not been for the accidental fact that the park was located in the immediate vicinity of this land, thus giving it an unexpected value to a vast extent.

Again, even if appellee had, at the beginning, equities entitling him to redeem, he has lost them by sleeping upon his rights.    His delay has been too great to be heard to avoid a sale, even had it been irregular, as there was no fraud in making the sale.    A party, under such circumstances, must act with some degree of promptness, or show an equitable excuse for his delay.    He was not lulled into security by anything Dempster did or said.    On the contrary, Dempster was importunate for his money, and finally notified him that he must sell to make his interest.    All of this appellee let pass

without paying, and virtually consented that the sale should be made. There was certainly such *laches* as would have prevented a redemption, even had there been irregularities in conducting the sale. Nor do we see that there is the hardship supposed. Appellee never paid. on the entire purchase, as much as $3000. He only held the legal title, still owing for the land, which, when sold, was worth less than $7000, and less than the amount then due on the purchase. Owing to the deranged condition of the country and the currency at the time, there was but little demand for lands of this character, and hence appellee could not dispose of it for a price that would pay the debt.

This sale was made subject to the Turney mortgage, which amounted to near the value of the land at the time the sale was made. Again, Kedzie, at first, and Dempster after he purchased the notes and mortgages, held the superior natural equity in the land. It was the unpaid purchase money, and it was a claim higher and more just than that of appellee, who had not paid it, and could not hold the land until he did.

The evidence fails to show that the relation of agent between Kedzie and appellee existed to such an extent as to have prevented him from making the sale. Appellee had only requested him to look after the property and collect the rents, which he did gratuitously until he sold the notes to Dempster, when he informed appellee of the fact, and notified him that his connection with the property then ceased.

Kedzie swears he was not authorized to sell the property otherwise than by the deed of trust, but only to receive and report offers to appellee for his acceptance or rejection. As the witness says, this required no authority or agency. Those acts could have been performed by any one who might choose. When the mortgages were given, and the transaction was closed, and the request made to look after the land and collect the rents for the present, the parties could not have intended that such action on the part of Kedzie would prevent

him from legally executing the power to sell under the mortgages. Nor did any such consequences flow from those acts.

After a careful review of the evidence in the case, we have no hesitation in saying appellee has entirely failed to make a case requiring the sale to be set aside, and that he be let in to redeem.

The court, therefore, erred in rendering the decree it did, and it must be reversed and the bill dismissed.

*Decree reversed.*

Mr. CHIEF JUSTICE BREESE: I do not concur in this opinion.