LOUIS BUSH *et al. v.* BENJAMIN F. SHERMAN,

and

BENJAMIN F. SHERMAN *v.* LOUIS BUSH *et al.*

1. MORTGAGE —*mortgagor voluntarily going within the enemy's lines.* Where a mortgagor voluntarily went within the enemy's lines, with a view to cast his lot with those who were in open rebellion against the government, the right of the mortgagee to execute the power of sale contained in the mortgage was not thereby impaired.

2. SAME—*assignee may execute power of sale.* The assignee of a mortgage containing a power of sale, being the legal holder of the indebtedness thereby secured, is authorized to execute the power of sale.

3. SAME—*whether property is released as to mortgagor by agreement to release as to purchaser.* A mortgagor sold one-half of the mortgaged premises, and the mortgagee agreed with the mortgagor and purchaser that, after a certain payment was made on the mortgage debt, he would hold the half of the premises so sold for one-half of the balance of the mortgage debt only, with an express proviso that the mortgagor should not be released from the payment of any portion of the mortgage debt. Afterwards, the installment required to be paid was paid, as was also one-half of the residue of the mortgage debt, but no application was made to have the holder apply it in discharge of the mortgage indebtedness on the half so sold, and it was not so applied. After making some payments, but before the one-half of the mortgage debt was paid, the purchaser, being unable to complete his purchase, reconveyed, for a nominal consideration, to the mortgagor, the half so purchased by him, losing all benefit of what he had paid: *Held,* that the half so sold and reconveyed to the mortgagor was not released from the mortgage.

4. Such a contract, although without any consideration, would be binding upon the mortgagee as to the purchaser, if he acted upon it and paid his money, but would not be as to the mortgagor; and when the property was reconveyed by the party for whose benefit the contract was made, to the mortgagor, who, by the express terms of the contract, was not released from the payment of the mortgage debt, the contract as to him being without consideration, was a nullity, and the mortgagor had no right to have payments subsequently made on the mortgage debt applied upon any particular part of the mortgaged premises.

5. SAME—*what notice of sale should contain.* It is sufficient if the notice of sale under a mortgage containing a power of sale contains enough to show there has been a default in the conditions, and also that it recites any facts the mortgage itself may provide it shall contain.

6. SALE—*burden of proof on the party charging fraud.* When a sale under a mortgage is challenged on the ground of fraud and collusion between the seller and the buyer, the burden of proof is upon the party making the charge to prove it.

7. TRUSTEE—*after the trust is executed, trustee may buy property.* After a trustee has made a sale, under his power as trustee, in good faith, and has fully discharged his trust, so that he no longer occupies confidential relations to any one claiming the property, he is not by law forbidden to deal with what was the trust property the same as a stranger, and, acting in good faith, he may become the owner by purchase or otherwise.

8. TRUSTEE'S SALE—*acquiescence waives all irregularities.* Acquiescence, unexplained, for any considerable time, in a sale which is voidable, but not void, will be deemed a waiver of all mere irregularities that may have intervened.

9. Ignorance of facts which are claimed as vitiating a sale, is not a sufficient explanation of long acquiescence in such sale, if such ignorance is the result of the conduct of the party in voluntarily going into the military service of the Southern States, in the late civil war.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

On the 23d day of May, 1856, Winchester Hall, one of complainants, purchased of Ayers and Hamilton a block of ground, which included within its limits the lands involved in this controversy. A portion of the purchase money was paid down, and the remainder, represented by six promissory notes, was secured by mortgage upon the premises, containing a power of sale. The notes matured in sets of two, of equal amount, in one, two and three years from the date of the sale. According to the testimony of Bush, the real estate was bought on the joint account of himself, Hall, and Richard, since deceased, whose heirs, by an amendment to the bill, have been made complainants, and that an agreement, in writing, showing the interests of the several parties, was signed at the time, but, for convenience, the title was taken in the name of Hall, who resided, or was about to reside, in Chicago, the other partners both residing in the State of Louisiana.

It was not disclosed to the vendors any person other than Hall had any interest in the purchase, nor was the alleged

agreement made a matter of record. So far as the public could know, or had any reason to believe, Hall was the sole owner. He treated the property as having the exclusive ownership, making contracts in relation thereto, and not disclosing that any one else had any interest in it.

On the 23d day of March, 1857, Hall sold the west half of the block to Joseph Smith, but the incumbrance created by the prior mortgage resting upon the entire premises, Smith would not consummate the purchase unless Ayers and Hamilton would agree that that portion he was proposing to buy might in some way be released from the mortgage indebtedness, so that he might acquire a clear title when he should pay for the same. Hall procured an agreement from Ayers and Hamilton, that, in the event of payment to them, at maturity, the installments to become due on the 23d day of May, 1857, they would agree to hold the west half of the block liable for only one-half of the residue of the unpaid purchase money, with the distinct reservation, however, that Hall was not to be released from the payment of any portion of the mortgage indebtedness. That arrangement was satisfactory to Smith, and was indorsed on the back of his contract with Hall, both of which were recorded on the following day. The installments maturing on the 23d day of May, 1857, were fully paid, and subsequently one half of the residue of the purchase money, but no application was made to have the holder apply it in discharge of the mortgage indebtedness on the west half of the block which had been sold to Smith, nor was it ever so. applied.

In the meantime, Sherman had bought of Ayers and Hamilton such of Hall's notes as were unpaid, and took an assignment of both the notes and mortgage, and thereafter controlled them. After making some payments, Smith found he would be unable to comply with his contract, and, for a nominal consideration, reconveyed the property to Hall, losing all benefit of what he had paid. On the 5th day of June, 1860, Hall conveyed by deed all his interest in the premises to Bush, to be by him held in trust for the parties originally interested,

except so far as Hall's interest was concerned—that was to be as security for his indebtedness to Bush; but that indebtedness has long since been adjusted, so that Hall now claims to be the equitable owner of one-third of the estate. Although this latter deed was upon record, it does not appear Sherman had any actual knowledge of its existence until about the time he was making the sales under the mortgage.

In April, 1861, all of Hall's notes given for the property, except one for $3445, had been paid either to Ayers and Hamilton or to Sherman after he became the owner. At the request of Hall, and for a consideration, Sherman extended the time of payment on this latter note until 1861, and, upon a like request, consented to a further extension until May 1, 1862, upon the positive agreement no further extension should be asked. Before the day of payment last agreed upon had arrived, open hostilities between the North and the South had commenced. Louisiana had, in the month of January, 1861, passed an ordinance seceding from the Union, which was a matter of public interest, and was, of course, known to Hall. Immediately after the fall of Fort Sumter, Hall left the State of Illinois for his former home at Thebadeaux, in Louisiana, with the avowed purpose to cast his lot with the people of the South.

Previous to his departure, Hall made no arrangements whatever for the payment of the balance due Sherman on the mortgage indebtedness. Perhaps in May, 1862, after New Orleans had come into the possession and under the control of the Federal armies, and communication had been established by rail and by water between Thebadeaux and New Orleans, Sherman wrote to Hall, at the latter city, to know if he could do anything towards paying his note. That letter was subsequently returned to him from the dead-letter office, with the post-mark of New Orleans upon it. One reason why Hall did not receive that letter was, he had previously entered the military service of the South, and passed within the rebel lines. Had he remained at Thebadeaux, his place of residence, he would have been within the Union lines all the time, except a

period of about six weeks in the summer of 1863, and had he been loyal to the government, he could have been in constant communication with New Orleans, and with Chicago, where his property was situated.

After waiting many months, and hearing nothing from Hall, Sherman advertised the property, and by virtue of the power of sale contained in the mortgage, on the 3d day of February, 1863, sold part of the premises to D. C. Nichols, and made him a trustee's deed for the same. Upon a like notice, on the 10th day of March following, he sold another portion of the property to Eben Colfax, and also executed to him a deed. The aggregate amount of these sales was about sufficient to discharge the mortgage indebtedness—perhaps a small balance remained. Both Nichols and Colfax conveyed that portion of the property purchased by them, respectively, at the trustee's sale, to Mrs. Cleaver, and it is under titles derived from her that defendants claim the property involved in this litigation.

This bill was filed to have the trustee's deeds to Nichols and Colfax, and their deeds to Mrs. Cleaver, set aside, and complainants let in to redeem the property on payment of what was due on the mortgage, and if, for any reason, that specific relief could not be granted, they might have a decree for compensation. On the hearing, the court dismissed the bill as to all defendants except Sherman, and found that, under the bill, there was due complainants from him $6714.65, and that he was chargeable on the ground of constructive, but not actual, fraud. From that decree, Sherman, as well as complainants, appealed. Both appeals are now to be considered as one case, on errors assigned by the respective parties.

Mr. WILLIAM H. KING, and Mr. GEORGE F. BAILEY, for Benjamin F. Sherman and others.

Messrs. WAITE & CLARKE, for Aaron Gibbs and others.

Messrs. MONROE, BISBEE & BALL, and Mr. C. M. HARRIS, for Louis Bush and others.

Messrs. HITCHCOCK & DUPEE, for the heirs of Victor Richard.

Mr. CHIEF JUSTICE SCOTT delivered the opinion of the Court:

Although made a ground of relief in the bill, it is not insisted in argument it was any obstacle in the way of the execution of the power of sale contained in the mortgage, that the mortgagor was within the enemy's lines during the late war. His absence from the State was voluntary, and was with a view to cast his lot with a people then in rebellion against the government. Had he remained at the home he selected in the South after open hostilities had commenced, he would still have been within the Federal lines, and within access to his creditors. The question of the right of a creditor, under such circumstances, to enforce payment of his debt, has been put at rest by the former decisions of this court. *Mixer* v. *Sibley*, 53 Ill. 61; *Willard et al.* v. *Boggs*, 56 ib. 163; *Harper* v. *Ely*, ib. 179; *Seymour* v. *Bailey*, 66 ib. 288; *Hall* v. *Connecticut Mutual Life Insurance Company*, 68 ib. 357.

Unless, therefore, the mortgage had been released as to the west half of the property, no valid reason existed why the creditor could not exercise the power of sale contained in the mortgage to foreclose and cut off the mortgagor's equity of redemption. Sherman was the assignee of the mortgagee, the legal holder of the indebtedness secured, and hence was the only party that could rightfully execute the power of sale. *Pardee* v. *Lindley*, 31 Ill. 174; *Strother* v. *Law*, 54 ib. 413.

Had any portion of the property been discharged from the operation of the mortgage, it is very clear no sale could thereafter be made that would legally affect the title. Whether any portion of the property included in the mortgage had been released prior to the trustee's sale, depends upon the construction that shall be given to the agreement of Ayers and Hamilton, of the 23d of March, 1857. The position assumed is, that, by reason of the agreement, with the superadded facts of the payment of the installments due May 23, 1857, and the subsequent payment of one-half of the residue of the purchase money, the west half of the property became

released, and was discharged from the effects of the mortgage, long before Sherman undertook to execute the power of sale. We do not think the position is warranted by any fair construction of the agreement—certainly not in view of what subsequently transpired between the parties. It will be remembered that Ayers and Hamilton were induced to consent to the agreement to release that portion of the property, as a matter of mere favor to Hall and Smith, to facilitate the making of the contract of sale between them. No consideration whatever was paid them, and no advantage in any respect accrued to them in consequence of making the agreement. On their part, it was a mere gratuity. No doubt the object the parties had in view was, that any payment made by Hall might be in reduction of the incumbrance on the west half of the property until it should be released by the payment of one-half the debt secured on the whole property, so that Smith might obtain an unincumbered title to that portion he had contracted to buy. It was a mere privilege to the parties to have all payments subsequent to the installment due on the 23d day of May, 1857, so applied, and nothing more. When acted upon, it would be binding upon the mortgagees, notwithstanding there may have been no consideration for the agreement. After Smith had invested his money upon the faith of the previous consent of the mortgagees to permit future payments to be applied in a particular way, they would be estopped to retract such consent. It would be inequitable and against good conscience; but the agreement was for Smith's benefit, and was in no sense for the benefit of Hall. Consent was given upon the express condition Hall was not to be released from the payment of any portion of the unpaid mortgage indebtedness.

Before any further payments had been made on the installments maturing after the 23d of May, 1857, Smith, being unable to complete his contract, reconveyed the west half of the property back to Hall. Hence there was no necessity for having future payments made by Hall applied in reduction of the incumbrance on that portion of the property, and neither Hall nor any one else ever asked to have them, nor

were they ever so applied.   Plainly it was no interest to Hall
to have the payments so appropriated, and he consequently
gave himself no concern about them.   His obligation was, to
pay the entire mortgage indebtedness, and it was a matter of
no consequence to him whether it rested on the east or west
half of the property.   It is a misconception of the meaning
of the agreement, to suppose that Hall, by reason of the recon-
veyance of the property to him by Smith, obtained it with the
privilege of having future payments applied in reduction of
the incumbrance upon the west half.   Clearly, any one claim-
ing under Smith as grantee would be entitled to the benefit of
the contract, but Hall claimed nothing as the grantee of Smith.
What was done, was the cancellation of the contract of sale.
That was the effect of the reconveyance.   After the reconvey-
ance, Hall held the property under the deed from Ayres and
Hamilton, the same as though no contract had ever been made
with Smith.   The circumstances proven establish most con-
clusively the parties themselves understood the agreement was
for the benefit of Smith, and not Hall.   After the reconvey-
ance, payments were made without any reference as to how
they were to be applied.

Although the agreement was on record, it appears Sherman
had no actual notice of it until about the time he was making
the sales under the power contained in the mortgage.   Hall
procured Sherman to release from the operation of the mort-
gage, portions of the east half of the property, without dis-
closing to him that he understood the west half had already
passed from under the mortgage.   When the release of por-
tions of the east half was made for Hall's convenience, it was
expressly agreed Sherman reserved and retained his lien upon
*all* the rest of the premises mentioned in the mortgage for
the then unpaid amount secured thereby.   Had it been the
understanding of Hall the west half of the property had been
or could be released on payment of one half of the unpaid
balance of the purchase money, it would have been a gross
fraud on Sherman, to procure from him a release of portions
of the east half while he was under the belief all the rest of

the premises remained subject to the mortgage, without disclosing that fact to him.

On every principle of justice, it seems to us, in view of what transpired between the parties, Hall is estopped to insist there was any release of the west half of the property under the agreement with Ayers and Hamilton. The acts of the parties are wholly inconsistent with any such theory. Neither Hall nor Smith ever asked to have the subsequent payments applied on the west half of the property, that it might be discharged from the mortgage lien, and they never were so appropriated.

But could it, by any fair construction, be held that Hall could avail of the agreement with Ayres and Hamilton, it might, with great justness, be said there was no consideration for it, and neither they nor their assignees were bound to perform it so far as he is concerned. Hall was in no position to be prejudiced by the non-performance, and he could invoke no principle of estoppel as against them. He was not induced, by any action on their part, to place himself in a position he would not have done had it not been for the agreement, and there could therefore be nothing inequitable in permitting them to retract, had they chosen to do so.

Most difficult of all the questions arising upon the record is, whether the sales made by Sherman under the power contained in the mortgage were effectual to foreclose the equity of redemption of the parties interested in the estate. Should it appear the power was rightfully exercised, the sales will not only bar the rights of Hall, but those of parties claiming the property under him as grantee or otherwise.

One objection taken is, the advertisements under which the sales were made were designed to mislead parties as to the amount remaining unpaid upon the mortgage. Only one note, the last in the series, was unpaid, but the notices published recited, in general terms, default had been made in payment of the mortgage indebtedness, without specifying in what particular. Who were interested in that question? Only Hall, and those claiming under or jointly with him. They knew

what amount had been paid, and of course were not misled. Strangers were in nowise interested in that question. So far as the public were concerned, and those that desired to become bidders or purchasers at the sale, it was enough that default had been made in the conditions of the mortgage. No complaint is made the trustee sold the property for more than was actually due. How, then, were complainants prejudiced by what is alleged to be a defective notice, and no creditors are complaining they were misled by it? But aside from this view, we are not aware the law has made it obligatory upon the trustee to state in the notice of the sale the exact amount due under the mortgage, nor does the contract of the parties, as set forth in the mortgage, require it to be done. It would seem to be sufficient if the notice contains enough to show there has been a default in the conditions, and also that it recites any facts the mortgage itself may provide it shall contain. More than that is mere redundancy, and can answer no good purpose.

Another point relied on with great confidence, as affecting the validity of the sale, is, that the trustee was both buyer and seller at his own sale, in violation of a well known rule of law. Upon this ground the right of complainants is based, to be let in to redeem the property, and, in case the specific relief can not be obtained, they may have a decree for compensation against the offending trustee, and those confederating with him.

One remarkable feature of the case is, there is not a particle of direct evidence in the record to sustain the allegation of the bill on this most important branch of the case, and the acts of the parties are all susceptible of an explanation consistent with entire fairness in the sale.

There is no conflict in the testimony. The answers of the trustee and the purchasers, as well as the first grantee of the purchasers, were all called for under oath. So far as they are responsive to the allegations of the bill, they are evidence, and were read on the hearing for that purpose. All other

170                    BUSH *et al. v.* SHERMAN.                    [Sept. T.

Opinion of the Court.

testimony on this branch of the case comes from defendants examined as witnesses.

The broad and unequivocal denials in the answers, of any collusion between the trustee making the sale, and the buyers, are fully sustained by the testimony, and no contradictory evidence appears in the record. The buyers bought and paid for the property with their own money, without any previous understanding with the trustee. Nichols, who bought at the first sale, himself made an arrangement with Cleaver to sell the property to his wife, and, in pursuance with that contract, it was afterwards conveyed to Mrs. Cleaver. With the preliminary negotiations, Sherman had nothing to do. Cleaver called upon Nichols in reference to another piece of property, and it was then for the first time he learned this property was for sale. All the proof is, the property was sold at a high figure, perhaps more than it was really worth. But a small cash payment was made, and the balance of the purchase money secured upon the property with no additional security. It was understood Cleaver was not then pecuniarily responsible, and unless the property appreciated in value, it was not thought anything could be realized out of the sale except the payment in hand. Afterwards, for a nominal consideration, Nichols transferred to Sherman the securities taken from Cleaver, and all benefit of the sale, and Sherman refunded to him the amount of his bid.

It is shown Colfax bought at the second sale for himself, and paid for the property at the time without any previous understanding with the trustee. Both Nichols and Colfax, according to the testimony, were abundantly able to buy the property and pay for it.

Soon after the second sale, Colfax entered into negotiations with Cleaver to sell him the part of the property he had bought. Under the belief he had effected a sale, he made a deed to the property, which was regularly acknowledged, but Cleaver, for some reason, refused or neglected to complete the purchase. Colfax, it seems, had then left the State, and the deed was placed in Sherman's safe, simply for safe-keeping.

Being unable to effect a sale, Colfax desired to get his money out of the speculation, that he might keep it at interest to defray current expenses. Many months after the sale, Sherman, at the request of Colfax, paid him back the amount of his bid, and took the property off his hands. Some time afterwards the trade with Cleaver was consummated, and for the purpose of making the conveyance, the old deed made by Colfax was used. Although this latter deed bears date in July, 1863, it was not, in fact, delivered until the trade was consummated in June, 1864, about the time the deed was recorded.

Complainants have challenged the fairness of the sales to Nichols and Colfax made by the trustee under the power contained in the mortgage. The burden of proof was upon them to establish the fraud and collusion between the seller and buyers. There is a total failure of evidence to establish the charges in that behalf. All the proof is the other way, and absolutely nothing to militate against it. Both the buyers and the seller declare, under oath, the sales were in good faith, and without any collusion or previous understanding. The bidders bought on their own account, and not for the trustee, nor in his interest. The sales were open, and all the world were at liberty to bid. It is not even suggested the sales were not openly and publicly conducted.

Assuming it to be proven, as we must do, from the testimony, the sales were fairly conducted, and the purchases *bona fide*, no valid reason can be assigned why they were not effectual to cut off the equity of redemption in Hall and all claiming the same estate through him. What contracts Sherman may have afterwards made in relation to the property could not vitiate the sales. When his trust had expired there is no reason in law or public policy why he could not contract in relation to the property the same as any stranger might do. At the time he negotiated with Nichols and Colfax in regard to the property, his duties as trustee had ceased, and he occupied no confidential relations to Hall or any one claiming the property. After the trust has been fully performed, and all

fiduciary relations ceased, the law has not forbidden the trustee to deal with what had been trust property as strangers may do, and, acting in good faith, he may become its owner by purchase or otherwise.

In the case at bar the equity of redemption had been cut off by a sale in all things substantially correct. The property had passed into the hands of third parties, and beyond the reach of the mortgagor. Upon principle, how could the former owner be affected by any dealing of his former trustee with the property. No policy adopted to preserve the utmost fairness between the trustee and the *cestui que trust* has inhibited the trustee, after their relations have wholly ceased, to deal with the property as any other person might do. This view of the law is warranted by the previous decisions of this court.

We had occasion, in the recent case of *Munn* v. *Burges*, 70 Ill. 604, to examine this branch of the law, and it was there said: "Jealous as courts of equity are, watching the conduct of a trustee in connection with the objects of his trust, he is only forbidden by them from dealing with the trust property for his own benefit, so long as the trust continues. The moment it ceases, he occupies precisely the same relation to it that strangers to the trust do, and, acting in good faith, he may become the owner by purchase or otherwise." The principle of this case is conclusive on this point in the case we are considering. When Sherman took an assignment to himself of the property bought by Nichols and Colfax, his duties as trustee had been fully discharged. He had not, previous to that time, dealt in the trust property for his own benefit, and what he did afterwards could, by no possibility, prejudice complainants. On principle, they had no interest in the property that could be misappropriated by him who had been their trustee. The deeds had been delivered and the property had passed irrevocably from the trustee and the *cestuis que trust* into the hands of *bona fide* purchasers, and they could sell it for any consideration they chose, to whomsoever would buy. Whether Sherman paid any adequate consideration for the property, is a matter of no consequence, and does not affect the decision.

Whether he did or not, affords no grounds for relief in their favor.

There is yet another consideration that bears strongly on the decision of the case. Should it be conceded the irregularities insisted upon actually existed, still the sale would not be absolutely void, but only voidable at the election of the parties interested in the estate. Acquiescence in the sale, unexplained, for any considerable time, will be deemed a waiver of all mere irregularities that may have intervened. Whatever may have been the *status* of Bush or Richard, or his heirs, in consequence of the civil war, they can assert no rights in this court that Hall could not maintain, had he been the sole complainant. Succeeding to his rights under the mortgage, whatever would bar relief as to Hall, would cut off relief as to them.

More than four years elapsed after the sales alleged to be irregular were made, before any steps were taken to set them aside. If Hall did not know of the existence of the facts which he now insists vitiate the sales, it was because of his own voluntary conduct. The exigencies of the war of the rebellion can afford no excuse for the delay in asserting whatever rights he may have had in the premises. Voluntarily he placed himself beyond the protection of the laws and government under which he had acquired his claim to the property he now seeks to have appropriated to him by a court of equity. The State to which he removed had already, by ordinance, manifested a purpose to withdraw from the Federal Union. He deliberately elected to cast his lot with the people of the South, and abandoned his property in the North to the chances of war. Whatever may have been his declared intention, it was of his own choice he placed himself in a position where he would be subject to be drafted into the armies organized for the destruction of the government, and if he had not volunteered he no doubt would have been compelled to enter the military service. He chose the former alternative, and enlisted in the armies of the South. Had he remained at Thebadeaux, the place selected for a home for himself and family, he would still have been, as we have seen, within the Federal lines, with the excep-

tion of a brief period in the summer of 1863. Direct communication was kept open, by rail and by water, between Thebadeaux and New Orleans, and from thence to Chicago, where his property was situated.

Had he remained in the vicinity of this property, it would doubtless be conceded he allowed an unreasonable time to elapse before bringing his bill, and surely it can not be asked for him, in a court of conscience, the application of a more liberal rule because he was absent through many years, engaged in a war for the destruction of the government. On what principle of justice can he invoke the application of a less stringent rule than would be applied to a citizen who had contributed by his presence and his means to the maintenance of those laws under which all property is secured? Without justifiable cause, he abandoned his property to what he called the "chances." No provision was made for removing the incumbrance he knew was liable to be foreclosed in a summary manner, that would cut off whatever claim he had to the property. He paid neither interest nor principal, and manifested no disposition to do so; nor did he make any provisions for the payment of taxes which was necessary to preserve the property for the parties interested in it. Most clearly he abandoned all his interests in the property to the vicissitudes of war. As was forcibly said by Mr. Justice Davis, in *McQuiddy* v. *Ware*, 20 Wall. 14, "here, there is a case of a party engaging in the rebelling without provision for his debts, to which there was no defense, asking a court of equity, after the lapse of many years, without sufficient excuse for the delay, to interfere in his behalf, because his creditors adopted the wrong methods for the enforcement of their claims against him."

Adopting the language of this court in *Hall* v. *Connecticut Mutual Life Insurance Company*, *supra*, as most appropriate, it is an anomalous excuse for a party to offer in a court of equity for not asserting, at an earlier period, whatever rights he may have had in the premises, "that he was voluntarily

away, engaged in a warfare for the destruction of the government."

In *Hamilton* v. *Lubukee*, 51 Ill. 415, it was said, "even if the mortgagee himself had been the purchaser through the aid of a third person to whom he could have conveyed, and then taken the title from him, such title would not be absolutely void, but voidable only, and if immediate steps should not be taken by the *cestui que trust*, the mortgagor, on his obtaining a knowledge of the sale, to set it aside, a ratification by him will be implied. Such a sale can be set aside only at the option of the *cestui que trust*, and that must be determined in apt time."

The case of *Munn* v. *Burges*, *supra*, has some elements in common with the one we are considering. It was said, "at most, the irregularity complained of in the sale only rendered the title voidable, and an application to set it aside for that cause should have been made within a reasonable time, and before the rights of innocent third parties had intervened." Numerous cases in this court declare the doctrine of *laches* as applicable to the case at bar. *Dempster* v. *West*, 69 Ill. 613; *Cox* v. *Montgomery*, 36 Ill. 398; *Winchell* v. *Edwards*, 57 Ill. 46; *Seymour* v. *Bailey*, *supra*.

The principle that lies at the foundation of all the cases in this court upon this subject is, the party who challenges a sale on account of irregularities that may have intervened, must be diligent in discovering that which he alleges will avoid the sale, and diligent in his application for relief. Unreasonable delay, not explained by equitable circumstances, has always been declared evidence of acquiescence in the sale, and a waiver of all mere irregularities. A party will not be permitted to delay, to enable him to speculate on the chances of an appreciation in values of the property, and elect to avoid the sale only where it will be profitable to do so. He must make his election at the earliest practicable moment.

In the case at bar, complainants are only seeking to enforce equitable rights. Default had been made in the conditions of the mortgage, and all that remained to them, under the most

favorable construction, was the equity of redemption in the property. Relief, in no view, could be had, except in a court of chancery, and upon terms that should be just to all parties. At the sales under the power contained in the mortgage, the property sold for its full cash value. Since then, it has increased many times in value, so that now it would be desirable to redeem the property. No great speculation could have been anticipated shortly after the sales.

All the facts complainants now know, upon which they base the theory the sales are invalid, would have been in the reach of Hall, had he not voluntarily gone beyond the Federal lines while the war was in progress, where it was impracticable to return. Such facts were matters existing on the public records, and were readily accessible to any one seeking to know them. Actual hostilities ceased between the North and the South in the spring of 1865. Shortly thereafter communication was fully established between all sections of the country. The mails were established and travel was entirely safe. It was practicable for complainants, had they instituted inquiry, to have obtained all the information they now possess, in the year 1865, yet this bill was not filed until December, 1867. Perhaps one reason is, the property had not then appreciated in value to so great an extent.

Complainants have shown no equities superior to those of defendants. Now, since law has been established that gives value and permanent security to property, they seek to recover that which had been deliberately abandoned. Previously, no effort had been made to discharge the incumbrance resting upon the property. This, it seems to us, would be inequitable, and especially after the lapse of so great a period, even if it should be conceded complainants may have had equitable rights in the premises, had they asserted them in apt time.

After a most careful examination, we discover no grounds for relief, in any view of the case that can fairly be taken. The decree will therefore be reversed and the bill dismissed.

*Decree reversed.*