MARY CLEAVER *et al.*

*v.*

HETTY H. R. GREEN *et al.*

*Filed at Ottawa June 16, 1883.*

1. SALE UNDER TRUST DEED—*personal notice to grantors.* A trust deed given to secure the payment of a note, with interest, provided that on default of payment of either principal or interest the trustee might sell the premises conveyed, on giving twenty days' notice of the time and place of the sale, in any daily newspaper of the city where the property was situate, and waived any personal notice to the makers of the deed. Before any sale was made the makers sold and conveyed their equity of redemption to a third person. It was *held*, the fact that no personal notice of the time and place of a sale subsequently made was given to the makers of the trust deed, was no ground on which to have the trustee's sale set aside.

2. SAME—*of trustee's duty to subdivide land and sell in parcels.* Where property conveyed by a trust deed, to secure the payment of money, is situated outside of the limits of a city, in a district occupied chiefly for residences, and is not larger in quantity than is desirable for a residence, a failure on the part of the trustee to divide the same and sell in parcels, there being nothing in the trust deed imposing such duty, was held no ground to avoid a sale made by him in pursuance of the power in the deed.

3. SAME—*inadequacy of price.* It is not to be expected that property will bring as much at a forced sale as if sold at a private sale by judicious advertising and management, and because it does not is no sufficient reason for setting aside the sale, when there are no unfair or fraudulent practices, and when there is no such inadequacy of price as to raise a presumption of fraud.

4. SAME—*relief against, barred by laches.* Where property is sold by a trustee under a power in a trust deed, the makers of which had conveyed their equity of redemption to one who had made no complaint, and about five years afterward a subsequent purchaser reconveyed the property, when the original owners filed a bill to set aside the trustee's sale and deed, for irregularities, it was *held,* that the *laches* in the case was of itself a bar to the relief sought, when no satisfactory excuse was given for the delay.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. GEORGE GARDNER, Judge, presiding.

Mr. J. W. WAUGHOP, for the plaintiffs in error.

Messrs. PADDOCK & IDE, for the defendants in error.

Messrs. McCoy, POPE & McCoy, also for the plaintiffs in error, in reply.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

Prior to and on the 13th day of March, 1872, Mary Cleaver was the owner, in her own right, of the property in controversy. On that day her husband, Charles Cleaver, borrowed of Hetty H. R. Green the sum of $10,000, for which he gave her his note, payable five years after date, with interest at ten per cent per annum, the interest being made payable semi-annually. To secure the payment of the note, with the interest thereon, Mary Cleaver joined with her husband,

Charles, in making a trust deed on the property which is now the subject of this litigation. Benjamin E. Gallup was named trustee in the deed. The trust deed contained the usual power of sale on default being made in the payment of either the interest or principal of the note. Later on, default was made in the payment of the note, and the trustee, on the request of the holder, advertised the property for sale, as it is provided in the trust deed it should be done, and on the day appointed it was sold to Hetty H. R. Green, the holder of the indebtedness secured, for the sum of $8000. The sale was made in September, 1877, after the principal of the note had become due. In the spring of 1876, Mrs. Cleaver,—her husband joining with her in the execution of the deed,—conveyed the 195 feet in controversy, and another lot adjoining it, having a front of 80 feet, to Francis E. Hinckley, by warranty deed. The terms of the sale to Hinckley do not fully appear. It is proven, however, that Hinckley agreed to pay and discharge the indebtedness of Charles Cleaver secured by the trust deed, but that, he did not do. It further appears Mr. Cleaver left $4000 in the hands of Hinckley with which to pay the back and current taxes on the property conveyed to him. Of the taxes charged against the property he only paid a part. Whether Hinckley paid Mrs. Cleaver anything on the property at the time he purchased it of her, is not shown by the testimony. Some time after the trustee's sale of the property to Mrs. Green, Hinckley seems to have reconveyed the property to Mrs. Cleaver. The date of the reconveyance is not definitely fixed by the evidence. At first, Mr. Cleaver stated it was in 1878, but afterwards stated he thought it might have been as late as 1881. There is no doubt it was some time after the trustee's sale.

On the 11th day of March, 1882, Mrs. Cleaver filed her bill in the Superior Court to set aside the trustee's deed to Mrs. Green, and to be permitted to redeem the property, and tendered with her bill the full amount due on the note secured

by the trust deed, with the accrued interest thereon.   The principal grounds on which the validity of the sale is attacked are:   First, that the notice given of the sale was not sufficient, and that neither the owner nor her husband had any actual notice of the contemplated sale; second, that the land was susceptible of division, and had it been subdivided it would have sold to better advantage; and third, it was sold for an inadequate price.   As respects the sufficiency of the notice, it is provided in the trust deed, in case default should be made in its conditions the property might be sold by the trustee to the highest bidder, for cash, at the north door of the court house, in the city of Chicago, after having given twenty days' notice of the time and place of the sale, by an advertisement in any daily newspaper that might be published at that time, in the English language, in the city of Chicago. Personal notice was expressly waived.   The notice given, under which the property was sold, was published twenty-one times before the day of sale, in the "Chicago Evening Journal," a daily newspaper published in the city of Chicago, precisely as the trust deed provided it should be.   No complaint is made that the "Chicago Evening Journal" is not a daily newspaper of general circulation, nor is any specific objection taken to the notice.   It is said it was a "formal and not a general notice."   How it could be less formal or more general is not perceived.   It is precisely such a notice as the parties contracted should be given.   But it is said no actual notice was given to complainant of the proposed sale.   Two answers may be made to the objection taken:   First, it was expressly provided in the trust deed personal notice was waived; and second, at the date of the trustee's sale complainant had parted with the equity of redemption, and at that time it was in Hinckley, her grantee under a warranty deed, and, so far as this record discloses, it is not perceived that either complainant or her husband had any interest in the property.   The proof is, Hinckley had agreed to pay the in-

cumbrance on the property, and it would seem that personal notice to complainant at that time would have been of no sort of use. Notice to Hinckley, if any personal notice was necessary, would have been of more avail. It does not appear the trustee had notice that Hinckley had assumed to pay the incumbrance on the property, but his partner in the office with him was notified of that fact before the sale. There is no just reason for insisting that complainant should have had actual notice of the sale.

Great stress is laid on the point made that the property should have been subdivided by the trustee, and sold in smaller lots. No provision of the trust deed made it his duty to subdivide the property before making the sale, nor can it be said, as a matter of law, under the circumstances it was his duty to sell in parcels. It will be remembered this is not business property. It is what the witnesses call "suburban property,"—residence property,—and is situated outside the limits of the city of Chicago, and in the north part of the village of Hyde Park. It is situated in the midst of residences. At most it is a small tract of land, being 195 feet front, with a depth of 200 feet. The evidence shows a number of persons residing in that vicinity have residence property as large, and some even larger, than this whole tract. The entire tract is a small lot for a suburban residence, and to subdivide it might, in the estimation of many persons, render it less desirable for residence property, situated, as it is, so far away from the populous portion of the city. Simply omitting to make any subdivision of the property before sale, when he was not required so to do by the conditions of the trust deed or the mortgage, is not evidence of bad faith on the part of the trustee. A prudent owner might have done the same thing with his own property.

It may be the property was sold for less than its real value. The testimony shows property in that vicinity, at the date of the trustee's sale, was unsalable for cash. At all events it

was dull sale, and some of the witnesses say there was really no demand,—at least very little,—for it. The price at which the property was bid off was $8000. That may not have been the full value of the land. It is certain, however, no one appeared to bid more for it, although the sale was advertised for more than twenty days in one of the daily newspapers published in the city. As has been seen, Hinckley, although he had obligated himself to pay the incumbrance resting on the property, failed to do so. At that time the indebtedness secured on the property probably did not exceed $12,000 to $14,000, and had there been any great speculation in the property at that price, it is hardly probable he would have allowed it to go to sale. In addition to the amount bid there were unpaid taxes on the property, the exact amount of which is not disclosed, which should be considered as an addition to the sum bid at the trustee's sale. On the whole case considered, the price at which the property was bid off is not so inadequate as to shock the judgment, or raise any presumption of fraud. It is not to be expected that property will bring as much at a forced sale as it could be made to do at a private sale, by judicious management and by unusual advertising, and because it does not, it is no sufficient reason for setting aside an official sale, where there have been no fraudulent or unfair practices.

The decision of this case might, with much propriety, be placed on the doctrine of what the law calls *laches*. This defence is set up in the answer of defendants, and insisted upon. It is seen, nearly or quite five years elapsed after the trustee's sale before this bill was filed to impeach it. For several years of that time the equity of redemption was in Hinckley. So far as he is concerned he seems to have acquiesced in the sale,—at least no complaint is heard from him during all that period. After Hinckley made a quitclaim deed for the property to Mrs. Cleaver she brought this bill to set aside the trustee's sale. It is not questioned that

complainants knew of the trustee's sale within a few weeks after it was made. To avoid the effect of this unreasonable delay, it is said defendants held out that all they wanted was their money, and under that belief complainants made valuable improvements, on the understanding they would be permitted to redeem the property. It is not claimed complainants had any contract with defendant Green that she might redeem the property at any definite future time. The utmost that is claimed is, that the husband of Mrs. Green, the purchaser, when on a friendly visit at the home of complainant on the premises, on a Sunday afternoon, while viewing the improvements that had been recently made, said to *Mr. Cleaver,* to keep on,—that all *he* wanted was *his* money, and the sooner he got it the better it would suit *him.* The husband of the purchaser, in his testimony, denies that he made any such statement, and further says he had no authority from his wife to make any arrangement to that effect. If it be conceded, which it is not, that the husband was the agent of his wife, he was not transacting any business for her at that time, so that what he said became a part of the *res gestæ,* and therefore competent evidence. At most, this was but a casual conversation between two persons, neither of whom had any real interest in the property. Their wives were the parties in interest. Such a conversation is certainly not obligatory on the parties claiming to be the owners of the property. The improvements alleged to have been made by complainants were insignificant in value, and there is not the slightest evidence Mrs. Green had any knowledge they were doing anything on the property. At that very time Mrs. Green had caused her agent to place a board on the property that it was for sale. The doctrine of *laches* is stated by this court in *Bush* v. *Sherman,* 80 Ill. 160, where it is said: "The principle that lies at the foundation of all the cases in this court upon this subject is, the party who challenges a sale on account of irregularities that may have

intervened, must be diligent in discovering that which he alleges will avoid the sale, and diligent in his application for relief. Unreasonable delay, not explained by equitable circumstances, has always been declared evidence of acquiescence in the sale, and a waiver of all mere irregularities. A party will not be permitted to delay, to enable him to speculate on the chances of an appreciation in value of the property, and elect to avoid the sale only when it will be profitable to do so. He must make his election at the earliest practicable moment." The principle of this case has its application to the one being considered, and ought to control it. Complainants have shown no satisfactory reason why they did not insist the sale was invalid many years before they did. They knew of the sale of the property very soon after it was made. There is not a particle of testimony that shows, or even tends to show, the purchaser at the trustee's sale did or said anything to throw them off their guard, or to induce them to sleep on their rights, if they had any.

In no view that can be taken is there any tenable ground upon which the trustee's sale can be set aside. After a most painstaking examination of everything in the record, nothing is perceived that the law will take hold of and afford the desired relief. So far as this record discloses, the trustee's sale was fairly and honestly conducted, in strict compliance with the power contained in the trust deed, and must be permitted to stand.

The decree of the Superior Court will be affirmed.

*Decree affirmed.*