ADELE WILLIAMS

*v.*

DANIEL P. RHODES *et al.*

1. JUDICIAL SALE—*sale en masse.* Unless a sale of real estate *en masse,* which is capable of division, is shown to have worked an injury by producing less than if sold in parcels, the sale will not be set aside, and the objection, at most, is such as can only be availed of in apt time.

2. EXECUTOR'S SALE—*to pay debts.* An executor's sale of real estate, under a decree of court, to pay debts of his testator, can not be impeached or set aside because sold to pay debts not presented and allowed, if he is notified of their existence and they are *bona fide;* nor does it matter whether they were secured or not.

3. PURCHASER—*one participating in profits of his own sale.* A trustee or executor who becomes a purchaser at his own sale, by an agreement with the purchaser to share in the future profits or losses, is guilty of a

constructive fraud, and can obtain only a voidable title; yet, if he acts in good faith to make the property realize all that he can, and more is paid for the property than any one else is willing to pay, the *cestui que trust*, or devisee, is not injured in fact. If the property produces all that it is worth, and nothing is done to prevent competition in bidding, the fact that the executor is to share in the profits expected from holding the property for future speculation, will not be fraud in fact.

4. Same—*ratification of sale in ignorance of fact, not binding.* If a devisee executes a conveyance of his interest in property sold by an executor, to the purchaser, in ignorance of the fact that the executor was interested in the purchase, it will not have the effect to ratify the sale or estop him from exercising his election to have the sale avoided upon discovering the real facts.

5. Administration—*erroneous credits in account as evidence of fraud.* An account of an executor, made out by his attorney in his absence and without his knowledge, in which he is credited with one or two items not in fact paid, is not sufficient to show actual fraud; and one who has received more money from such executor than entitled to by law, is not in a position to complain of the account for such errors.

6. Laches—*in seeking to set aside sale.* A party can not be charged with *laches* in asserting his right to have an executor's sale of land set aside on the ground of merely constructive fraud, where there is no actual fraud, until after knowledge of the facts or of circumstances sufficient to put him on inquiry which would have led to such knowledge.

7. Same—*ignorance of law as an excuse for delay.* As a general rule, a court of equity will not relieve a party on account of ignorance of the law, where the facts are known. There may be exceptions to this, as, in cases of imposition, undue influence, misplaced confidence, surprise, etc.

8. Same—*delay, to defeat bill to avoid sale.* A bill filed, wanting a little over a month of five years after knowledge of the facts, to set aside an executor's sale of real estate to pay debts, on the ground that the executor was interested with the purchaser in the future profits expected to be realized, where no fraud in fact, imposition or undue influence was shown, was held such an unreasonable delay and *laches* as to defeat the relief sought, especially where the property bought was of a highly speculative character.

9. Same—*when need not be pleaded.* Where the bill attempts to excuse the delay in bringing suit, the defendant may avail himself of the defense of *laches* without setting up the same in his answer.

Appeal from the Circuit Court of Cook county.

This was a bill in equity, by Adele Williams, against Daniel P. Rhodes, Thomas Dobbins, Richard Gregg, Robert Williams, Robert M. and Stephen A. Douglas, to set aside a sale of cer-

tain real estate made by Rhodes, as executor of the last will of the late Stephen A. Douglas. The cause was heard upon bill, answers of the several defendants, replication thereto and proofs. The court below dismissed the bill, and the complainant appealed.

Messrs. McDAID, WILSON & PICHER, Mr. M. W. FULLER, and Mr. MAT. H. CARPENTER, for the appellant.

Messrs. McCAGG & CULVER, for the appellees; Mr. JOHN N. JEWETT, for appellee Gregg; Messrs. HARDING, McCOY & PRATT, and Mr. CHARLES H. MORSE, for appellee Dobbins.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

On the 26th day of September, 1864, Rhodes, as executor of the last will and testament of Stephen A. Douglas, deceased, sold, at public auction, certain real estate to Dobbins. The sale was authorized by decree of the circuit court of Cook county, and no question arises as to the regularity, in form, of the sale. On the 6th day of January, 1865, the complainant, who was the widow of Douglas, and devisee under his will of one-half of his property, as well as guardian of his children, conveyed, by deed of quitclaim, to Dobbins, all her interest in the property purchased by him at the executor's sale.

Complainant claims that the purchase by Dobbins was, in fact, not for himself alone, but for himself, Rhodes and Gregg —each being interested therein to the extent of one-third; that she was ignorant of this fact when she executed her deed of quitclaim to Dobbins, and only learned it recently before filing her bill. She asks that Dobbins, Rhodes and Gregg be decreed to be trustees, holding one-half of the property so purchased, as trustees, for her use; that they account for the profits of such as has been sold, and that they convey to her the legal title in the undivided one-half of the residue.

The decree in favor of Robert M. and Stephen A. Douglas (the co-devisees of the complainant), under their cross-bill, is

not before us, and the conclusion we have arrived at in nowise affects the merits of that decree.

The charge is made that Rhodes has been guilty of both actual and constructive fraud, and the questions thus raised will be first considered.

In support of the charge of actual fraud, it is claimed Rhodes sold certain portions of the property *en masse*, instead of by lots, into which it had been previously sub-divided; that he sold the property at a ruinous sacrifice; that he sold unincumbered property, when there was no necessity that it should be sold, to raise money to pay debts; that he and Dobbins induced complainant to execute a quitclaim deed, without disclosing what interest she then had in the property that would pass by the deed, by false representations, etc., and finally, that he has rendered false accounts of his administration of the estate.

We are not satisfied, from the evidence, that complainant has suffered any injury from the sale of the property *en masse*, since it does not appear that it would have sold for any more, in the aggregate, had it been offered in separate lots. The objection, at most, is such as can only be availed of in apt time by having the sale set aside, and is considered as waived by unreasonable delay. It might, indeed, be a circumstance, in connection with others, proper to be considered as tending to show a fraudulent design to waste the estate, but we do not, in the present instance, regard it as of controling significance in that respect.

The most valuable of the property was known as "Oakenwald and University subdivisions." It had been mortgaged by Douglas, in his lifetime, to James R. Smith, of Connecticut. He foreclosed his mortgage subsequent to the death of Douglas, and, at a master's sale on the 21st day of November, 1863, purchased the property; so there were two months, lacking five days only, after the executor's sale, within which the purchaser could redeem. The amount actually paid, in redeeming from the sale to Smith, on the 21st day of November, 1864, was $92,664, which, we assume, it was necessary should

be paid to effect a redemption. The property was, also, other-
wise incumbered by a tax sale, and by a claim asserted in
favor of one Mrs. Russell, and which has since been the sub-
ject of litigation—so far, however, resulting against the validity
of the claim.

Dobbins' bid on the "Oakenwald" property was $13,000,
and on the "University" property, two hundred and some
odd dollars, and by his agreement with Rhodes, made prior to
the sale, he was compelled to, and did, pay an additional sum
sufficient to make the amount paid by him for the property
$25,000, in addition to the amount necessary to redeem from
Smith.

So far as we have discovered, but two witnesses express the
opinion that the sum paid by Dobbins was not a reasonable
estimate for the value of the property, at the time, encum-
bered as it was. These are N. P. Iglehart and James R.
Smith.

Iglehart had been, previously, at his own request, appointed
agent for complainant, in regard to the property. What was
the precise extent of the authority conferred upon him in that
behalf, does not appear, nor is it important here. At the
instance of Rhodes, he prepared maps of the property, and
made estimates of value, to induce persons to purchase. The
estimates made by him aggregated $300,000, and, in his evi-
dence, he says, in his opinion, they were reasonable. They
are, however, subject to the very important qualification that
the lots were to be "*judiciously sold, within* five years." To
test the wisdom of his estimates, and they were based on that
hypothesis, it was essential that money should be raised to
relieve the property of the liens upon it; and he says, " I did
not think it worth much if liens could not be raised—thought
it likely it would be swept off by the liens." And in a letter
written by him to Rhodes, under date of October 24, 1863, he
uses this language: "Now, my idea is, for you to get an
order of sale at once, and sell all the right there is in all the
pieces of property. They would not bring much, but in
Woods' case and *James R. Smith,* etc., *I would give a few*

*dollars for them to hold just for the benefit of widow and children."*

The order was obtained as suggested, the property sold, and Mr. Iglehart was at the sale, and purchased some property, but he did not, whatever the actuating motive may have been, deem it advisable to exceed Dobbins' bid for this property. The objection to his estimates is thus manifest—they rest upon an impracticable basis. If the estate had been possessed of the money necessary to relieve the property from the liens, which could have been devoted to that purpose, there would have been no necessity nor excuse for the sale by the executor. The fact that there was no money with which to redeem from the incumbrances, rendered the sale at once necessary—and it had to be sold with reference to existing incumbrances, and the condition of the market as it then was, and not disincumbered, and when, in the next five years, there should be the best market for such property.

Smith thinks the amount Dobbins bid was greatly less than the value of the property; but there are some circumstances which materially weaken the effect of his judgment. He was not a resident of Chicago, and was only advised of the value of property by inquiries that he made of others. The evidence shows the sale was extensively advertised, and strong personal appeals had been made to capitalists dealing in such property, and those who had been personal friends of Douglas, to be present and bid at the sale. If his judgment is accurate, it would seem that there ought to have been found some one who would have exceeded Dobbins' bid. He professed to have been a friend of Douglas in his lifetime, and to have been anxious to benefit his wife and children, and he thinks this may have had influence with him (he thinking Dobbins' bidding was for their benefit), in preventing his bidding what he otherwise would. This is hardly consistent with the fact testified to by Rhodes, and not contradicted, that Rhodes offered him $5000, to extend the time for the payment of the money secured by his mortgage for two years, which he declined, but proceeded to foreclose at a period when, as shown by the

evidence, it was exceedingly difficult, if not impossible, to effect advantageous sales of such property; or with the fact, testified to by himself, that he did, for some time, bid on the property beyond the amount of his claim; nor with the fact, testified to by Meeker, that he (Smith) wanted Rhodes to stop the sale and agree upon a price,—offering $5000 beyond the amount due him on his mortgage.

David A. Gage, a witness for complainant, resident in and familiar with the prices of real estate at that time in Chicago, says he had been applied to to take an interest in Dobbins' purchase, and he uses this language in regard to it as a speculation: "It was a thing in the future; if a man had money to invest, and faith in Chicago, I thought it might be a big thing, but I did not think there was a great amount of money in it immediately. Real estate was dull at the time; it was hard to get money—to make a sale prior to that time." And, again, he says: "The same amount of money invested in Chicago, anywhere, at these prices, would have realized as much as in this. I don't believe you could find many parties to give more for it at that time."

Farwell, likewise a witness for complainant, says he was also applied to, to take an interest in Dobbins' purchase, and he declined, because he regarded it, as he phrases it, "a long winded speculation."

John Forsythe, a capitalist and speculator, was at the sale, and bought some of the property that was sold. He says he knew something of nearly all of the lands, at the time of the sale. He was prepared to bid on the property, and bought as much as he thought he could make any money out of. He didn't want to buy anything in the "Oakenwald" or "University" subdivisions, because of their large incumbrances.

Dobbins, it appears, also purchased, at the sale, several tracts of land at or near Calumet, which were unincumbered by mortgage; for one of which, the west half of north-west quarter, section 31, township 38, range 15, he paid only $115.

Mr. Anthony testifies that, in his opinion, the land was worth from $35 to $40 per acre. This, however, is mere opinion,

fixed upon no possible *data*, and, doubtless, based upon impressions subsequently received, quite as much as upon his recollection of things as they were at the time of the sale. He admits the whole country there was then for sale—speaks of no sales occurring at or near that time, and says lands there were offered very low.

The land is described by Meeker and Chandler as swampy, marshy land—generally, before recent improvements by which it has been drained, covered with water; and Forsythe thinks all the Calumet lands sold for their current value at the time. There were, according to Meeker's recollection, from forty to fifty persons at the sale. Some of the outside lands were bought by persons living in the vicinity, and others were bought by Forsythe and Meeker. It is manifest, no one at the sale regarded the price paid by Dobbins as affording a prospect for a large speculation.

The evidence is entirely satisfactory that the sale was sufficiently advertised, and that Rhodes used unusual efforts to induce persons to attend and bid; and we are unable to discover any evidence tending to show that he, in any instance, did anything to prevent competition, or to induce property to be struck off for less than it would have otherwise brought.

The objection that more lands were sold than was necessary for the payment of debts, has no foundation. Debts are shown to have existed, payment of which had been solicited from the executor, to many thousand dollars in amount beyond the entire sum realized at the sale. That they had not been formally probated in the county court, was not important. It was sufficient the executor had been notified of the existence of the claims, and demanded to pay them; and, whether they were secured or not, being *bona fide* indebtedness due from the estate, the obligation rested upon him to raise funds, so far as this could be done from the estate, to meet them.

That the estate was regarded as hopelessly insolvent, until long after the sale, and none of the complainant's friends were able to assist her in saving any of the property for herself, is admitted by her, in her evidence.

Gage says, the last time Douglas was out, after his return home, immediately preceding his death, he told him he was poor, and spoke of his design, in the future, to labor to get some property for his family. On his dying bed, and in the presence of the complainant, Douglas, as Rhodes says, informed him he was bankrupt. His residence at Washington, to which complainant, after his death, returned and made her permanent home, was mortgaged, and the mortgagee was pressing for payment. There were no funds even for the payment of the current expenses of the complainant, much less to redeem from this mortgage. Complainant was, and naturally so, very anxious that this incumbrance on her homestead should be relieved, and she communicated knowledge of this anxiety to Rhodes. The amount finally paid in redeeming from that incumbrance was $10,500. To raise this sum, Rhodes made application to friends of the complainant, and those who had been friends of Douglas, for a loan, but in this he was unsuccessful. As a last resort, he endeavored to interest parties to purchase the equity of redemption, under the Smith mortgage, in the " Oakenwald and University subdivisions" property, and pay $25,000. There is evidence that he applied to a number of persons whose capital was sufficient to enable them to make the purchase, who declined. It does not appear that in any other way, than by the arrangement effected with Dobbins, was it feasible to raise the $25,000, or even the amount necessary to redeem the homestead in Washington; and, whatever ulterior damages Rhodes may have expected to reap from the purchase, we concur with the court below in believing that he was acting in good faith, to enable the estate to realize all the advantages that could be attained by a sale at that time. It was a most unfortunate time to make a sale, as subsequent events had proved; but it could not be postponed beyond the 21st of November of that year, between which and the date of the sale there was no reason to anticipate there would be, nor does there appear to have been, in fact, any material appreciation in the value of the property. It involves no necessary inconsistency to say that Rhodes may have labored

in good faith, to make the property realize the largest possible amount at the sale, and still felt there was a profitable speculation in it, at that price, in the future; and, although repugnant to a well established principle of equity jurisprudence, it is not sufficient evidence of moral fraud, or fraud in fact, that he should have been willing, after enabling the estate, in good faith, to realize all that was practicable by the sale, to share in the profits anticipated to result from holding the property for future speculation.

A trustee who becomes a purchaser at his own sale is guilty of a constructive fraud, and can obtain only a voidable title; and yet, if he acts in good faith, and pays more for the property than anybody else is willing to pay, the *cestui que trust* is not injured, in fact, and he is guilty of no actual fraud.

The complainant testifies she executed the quitclaim deed to Dobbins, at Washington; that Rhodes and Dobbins were present; that "Mr. Dobbins called and said, 'here is $25,000 that we present to you—that is the sum we want to present to you.'" She further says: "I got $25,000; Mr. Dobbins and Mr. Rhodes were anxious to make me a present. They did not pay me for anything. If any thing should be made, they gave me that; Mr. Rhodes gave it to me, for his friend Dobbins, about the time the deed was signed. I think, perhaps, it was the same day. Rhodes said to me, 'I have promised to secure my friend Dobbins against future claims; there is nothing in it; it is nothing more than to secure Dobbins from trouble.' Jackson read the deed to me. They were all there at the same time. The deed was made while all three were there."

This, uncontradicted, would strongly tend to show a fraudulent design by Rhodes and Dobbins, but it is contradicted. Rhodes says she promised, before the sale, to make a deed to the purchaser, whoever he might be; but he denies that he was present when the deed was made, or that he had any participation in the making of it. Dobbins denies that he was present when it was made, that he had requested it, or knew any thing about it before it was handed to him. Both he and Rhodes

deny that the $25,000 was paid to her by Dobbins, but say, on the contrary, it was paid by Dobbins to Rhodes, and Rhodes says he used $10,500 of it in redeeming her homestead, in Washington, from the lien on it, and paid the residue to her, or for her use, in a manner for which he sufficiently accounts.

The deed itself shows it was not acknowledged in Washington, but in Chicago.

Robert R. Rhodes, a son of Daniel P. Rhodes, testifies he was present when complainant signed and acknowledged the deed, and he attested it as a witness, and that it occurred at the Tremont House, in Chicago. He further says, Dobbins and his father were not present when the deed was signed.

If, at the time the deed was executed, complainant was ignorant of the fact that Rhodes was interested in Dobbins' purchase, as we think the evidence shows she was, it could not have the effect to ratify the sale or estop her from exercising her election to have it avoided when she subsequently learned of Rhodes' interest; but the evidence is clearly insufficient to sustain the charge of actual fraud in obtaining the execution of the deed.

There is evidence that the executor, in the account rendered by him to the county court, took credit for one or more items which he had not in fact paid. But this, we think, is fairly accounted for by the evidence that the account was made out by his attorney, in his absence, and without his knowledge. However incorrect that account may be, the evidence shows the complainant has been paid, by the executor, considerably more than she had any legal right to claim from him, and she, therefore, does not occupy a position to enable her to complain of his accounts.

From the preceding remarks, it results that, in our opinion, there is an insufficiency of proof to sustain the charge of actual fraud against Rhodes, on any of the grounds urged; and what shall be hereafter said, will, therefore, be upon the assumption that the case is relieved of that element.

We incline to the belief that the evidence warrants the conclusion that Rhodes was interested, secretly, in Dobbins' pur-

chase, at the time it was made, and that it was, therefore, competent for the devisees under the will of Douglas to have the sale set aside, or to hold the purchasers as trustees for their use, provided the right has not been lost by *laches*.

Assuming, then, that Dobbins' purchase was constructively fraudulent, and the title thereby obtained voidable, has complainant been guilty of such *laches* as should preclude her from recovering?

She can not be charged with *laches* in the assertion of her rights, unless it appears she had knowledge of what they were, or, at least, of circumstances sufficient to put her on inquiry, which would have led to such knowledge.

It is not pretended that she was informed, when the sale was made, that Rhodes was interested with Dobbins in his purchase. She had notice then that Rhodes had guaranteed that Dobbins should lose nothing by his purchase, but nothing more.

But, on the 1st of October, 1865, Rhodes wrote from Cleveland, Ohio, to complainant, in regard to some solicitation for money she would seem to have previously made to him, in explanation of why he could not let her have the desired money, as follows: "I would let you have the funds to pay him, if I had it, but just at this time I am poor for money, for this reason: My friend Dobbins paid all the money for the property purchased from the estate. He did not expect to want it again until some of the property would sell, but, on account of some troubles in the title to the property, has not sold, and I paid him up my part, amounting to forty-seven thousand, and that makes me a pauper just at this time, as you see."

Again, in a letter written by Rhodes to the complainant, dated "Paris, October 8, 1867," in explaining matters connected with the administration of the estate, and after complaining of the amount of the bill of the attorneys, he says: "But as my personal bond was given to Messrs. Dobbins & Gregg, as to the title to the Cottage Grove property, and they have made money out of it, this charge is made. Not a man

in Chicago could have done what Dobbins done at the time, for want of money. Dobbins would do nothing without my personal guarantee as to title, and agreeing to share in the losses or profits in the results with him."

Complainant was married to General Williams January 23, 1866, and he says that Rhodes, in conversations between them in regard to his administration of the estate, had between the 15th and 23d days of January, 1866, told him that, "after repeated efforts to induce persons to take hold of that thing," (meaning the Cottage Grove and University additions property,) "he met Dobbins at Chicago, and he mentioned the subject to him; that Dobbins, having money available, after much solicitation, determined to gratify Rhodes by going into the purchase, but that Dobbins was unwilling to take it in hand unless Rhodes was willing to participate personally in the transaction, and that, in order to induce Dobbins to go into the matter, he, Rhodes, consented to take one-third of the risk, I mean one-third of whatever came from it, he to put in one-third of the purchase money, and take one-third of what came of it, whether loss or gain."

The letter of October 1, 1865, seems to be a distinct and full statement, which any person of ordinary intelligence could hardly fail to understand, that Rhodes was interested in Dobbins' purchase to the extent of the $47,000 which he paid on account of the purchase. Surely no one could be so obtuse as to suppose, when he said he *had paid* $47,000 *for his part in the purchase*, that he had no interest in it. The language effectually excludes the hypothesis that the $47,000 were advanced as a loan or paid as a gratuity, for it is expressly " for my part." The mode of the statement, it is true, is incidental, rather than direct; still, it is clear and full, in explanation of a preceding subject; and it is impossible, in our opinion, that a person reading it would not as readily have comprehended it as if it had been the sole subject of the letter. It would seem, moreover, to imply previous knowledge of his interest by the complainant.

The information communicated some three months after-wards to Gen. Williams, was direct. From the circumstances under which it was given, it is evident that there was no design to conceal his interest, or how it was acquired, from the complainant.

The letter written from Paris on the 8th of October, 1867, is again a full and complete statement of his interest and how it was acquired, and from other portions of that letter it is evident information had been communicated to complainant from other parties, notifying her of his interest, and questioning his fidelity to his trust. He says, "The estate saved a good deal by Dobbins taking hold of the matter, and all these * * * and other ducks, could have done, was simply to rob, as all knew, at the time of the death of the judge, his estate was hopelessly bankrupt, and no one knew it better than the judge himself. Now, I want all these matters settled. If I have not done my duty in the matter, I want to be made to do it, and at an early day, too."

There is abundance of evidence that complainant, after being possessed of the information thus communicated in regard to Rhodes' interest in the Dobbins purchase, expressed herself as entirely satisfied with his conduct in the administration of the estate. Among other things, she writes him on the 23d of April, 1866, addressing him as—

"*Dear Cousin Dan:* You must have thought me very strange not to send you the receipt long before this, but I sent off your letter and forgot the receipt until this morning. Please forgive my forgetfulness. I have to thank you so much, dear cousin Dan, for all your care and trouble for us, and I hope, so much, you will continue to take interest in our affairs. Robert says that you have paid a little over $500 over the $25,000 you had for us, for which I thank you very much, cousin Dan, and I hope you will not lose anything by your goodness to us.

"Dear cousin Dan, please write me whether if there will be anything more coming to us from the Wood mortgage, or anything else now unproductive. Will you not take the suit

against Iglehart in hand for me, as he has not answered my letter yet, and I fear he does not mean to do so."

There is no doubt but that the $25,000 here alluded to is the $25,000 paid by Dobbins on his purchase, since there is no pretense that Rhodes ever received that amount of money for the estate from any other source. Out of this, her homestead at Washington, which she subsequently sold for $30,000, had been relieved of the lien of $10,500 pressing upon it; and if we shall accept as a fact, what the evidence pretty fully proves, that the estate, when Douglas died, was bankrupt, and but for exertions outside of the duties of an executor, and, perhaps, to some extent, unwarranted by the letter of the law, it would have been all consumed by his creditors, it is but reasonable she should have felt the gratitude she expressed; nor is it marvelous that she should have been satisfied with his having an interest in whatever of speculation there was in Dobbins' purchase, of which she had been informed by the letter, written on the 1st of the preceding October. It had benefited instead of injured her, and why not he, as well as a stranger, reap profit from it?

In answer to the letter written from Paris on the 8th of October, 1867, the complainant's husband, professing to speak for her, as well as himself, says:

"* * * * I think that Jackson agrees with me, but, of course, cousin Dan, you know best. You have had a weary and vexatious time with these matters, but I know well that no man has ever been truer to his trust; and, surely, cousin Dan, no father could have been kinder to his own children than you have been to Addie [complainant] and the boys. They feel it, and appreciate it as I do. We all wish to put upon record our appreciation of the good judgment, uprightness, care and affection with which you discharged the troublesome and disagreeable duties Mr. Douglas imposed upon you."

This was written on the 4th of November, 1867, only about two months less than two years after he says Rhodes informed him that "in order to induce Dobbins to go into the matter, he (Rhodes) consented * * to put in one-third of the purchase

money, and take one-third of what came of it, whether loss or gain."

We have discovered no evidence of a fact materially affecting Rhodes' connection with the purchase, which was not then fully known to the complainant and her husband. But it is argued, although the facts were known, the application of the law to those facts was not known, and complainant can not be held guilty of laches unless it appears she was first informed of the law, as well as the facts. affecting her rights; and authorities are referred to in support of the position.

It has been held by this court, in general terms, that a court of equity will not relieve on account of ignorance of the law, where the facts are known. *Goltra et al.* v. *Sanasack et al.* 53 Ill. 456; *Wood* v. *Price*, 46 Ill. 439. To this there may be exceptions, which we should recognize in cases of imposition, undue influence, misplaced confidence, surprise, etc.

Judge Story, in his work on Equity Jurisprudence, vol. 1, § 137, after reviewing the authorities bearing on the question, says: "We have thus gone over the principal cases, which are supposed to contain contradictions of or exceptions to the general rule, that ignorance of the law, with full knowledge of the facts, furnishes no ground to rescind agreements or to set aside solemn acts of the parties. Without undertaking to assert that there are none of these cases which are inconsistent with the rule, it may be affirmed that the real exceptions to it are very few, and generally stand upon some very urgent pressure of circumstances. The rule prevails in England in all cases of compromise of doubtful, and, perhaps, in all cases of doubted rights, and especially in all cases of family arrangements. It is relaxed in cases where there is a total ignorance of title, founded in the mistake of a plain and settled principle of law, and in cases of imposition, misrepresentation and undue influence, misplaced confidence and surprise. In America, the general rule has been recognized, as founded in sound wisdom and policy, and fit to be upheld with a steady confidence. And, hitherto, the exceptions to it (if any) will be found not to rest upon the mere foundation of a naked mistake of law,

however plain and settled the principle may be, nor upon mere ignorance of title, founded upon such mistake."

And these views are, substantially, adopted in the opinion of WASHINGTON, J., in *Hunt* v. *Rousmaniere's administrators*, 1 Peters, 1, and by Chancellor KENT, in *Storrs and Brooks* v. *Barker*, 6 Johns. Ch. 166.

The complainant's testimony is full to the point of her ignorance, under the law, of her rights, and of her helplessness and dependency on Rhodes, and of her entire faith in the correctness of all he did and said in regard to matters connected with the estate. That she had a right to expect good faith in all he did, and that he would exert himself to realize as much as was reasonably practicable from the estate, is conceded. He was the cousin of Douglas, and they were intimate friends, and, in her presence, he had promised Douglas to take care of her and his children.

But we are not satisfied, from the evidence, that the complainant was so entirely ignorant and helpless as to be incapable of any legal act in regard to her rights, or to absolve her from that degree of care and attention to them which the law exacts from all persons capable of acting for themselves. She was neither a minor nor laboring under any mental infirmity which disqualified her to act for herself. She was of mature years, and her high social position warrants the supposition that she possessed more than ordinary talents and culture. We must, therefore, infer, when she received the letter of Rhodes explaining that he had an interest in Dobbins' purchase, she comprehended what was meant. He was living at Cleveland, Ohio, and she at Washington City, and his presence, therefore, could not have been an impediment to full, free and mature reflection as to the effect the information had upon her rights, or have operated to induce her to acquiesce in rather than repudiate the sale. She was certainly not misled as to her legal rights, after this knowledge was received, by any representations made by Rhodes in that respect, for it is not pretended he ever gave her any opinion on the subject. It does not appear that she was without other friends with

whom she could and did counsel in regard to her business affairs; that she was unable to obtain legal counsel; or that she was coerced by any other circumstances creating a moral duress, which paralyzed, in the slightest degree, the freedom of her will, or blinded her eyes to a knowledge of her rights, in regard to this matter. On the contrary, the remoteness of her residence from that of Rhodes, would seem to have rendered it absolutely necessary that she should, in her business affairs, have relied much, either on her own judgment, or on the counsel of some friend, other than Rhodes, who was conveniently accessible. Besides this, there is an entire absence of evidence that, in any matter in which she relied on the counsel or advice of Rhodes, he wilfully deceived or misled her.

We do not think the evidence sufficient to relieve the complainant from the presumption of law that she had knowledge of her legal rights, as affected by the facts of which she was informed.

The bill was filed August 20, 1870, and it is argued that this does not show such a delay as a court of equity will regard as unreasonable in bringing the suit. It lacks about a month and one-third of being five years from the time the information was first communicated to her by Rhodes, that he was a party in interest in the purchase made by Dobbins, and is, therefore, less than the period of limitation fixed by the statute to an action at law upon an open account.

But the period of limitation in such actions, or, indeed, in any other class of actions, is not, necessarily, to control. Numerous cases have been decided by this court, where delay for a much less period than that fixed by the Statute of Limitations has been held to preclude the right of the party to bring the suit. In such cases, it is said, courts of equity act upon their own inherent doctrine of discouraging, for the peace of society, the prosecution of the suit; and no general rule can be laid down for the guide of the court in every case. "A delay which might have been of no consequence in an ordinary case, may be amply sufficient to bar the title of relief, where the prop-

erty is of a speculative character, or is subject to contingencies, or where the rights or liabilities of others have, in the meantime, been varied. If the property is of a speculative or precarious nature, it is the duty of the party complaining of the fraud to put forward his complaint at the earliest possible time. He can not be allowed to remain passive, prepared to affirm the transaction if the concern should prosper, or to repudiate it if that should prove to his advantage." Kerr on Fraud and Mistake (Bump's Ed.), p. 306–7.

The evidence shows, very conclusively, that the property bought by Dobbins was of a highly speculative character, liable to appreciate greatly in value, or to be depreciated, by the contingencies to which such property is subject. Complainant could not retain the benefits she derived from the sale, and, at the same time, repudiate it. In 1865, it does not appear that the property had a positive and fixed value far, if any, above the price for which it had been sold; and its value in the future, of necessity, rested upon conjecture. Suppose that complainant had repudiated the sale, and the property had depreciated below the purchase price, this would, necessarily, have entailed loss. It surely is not equitable that she, having the right to elect to either ratify or avoid the sale, shall be allowed to use the money obtained by it in other speculations, avail of the profits thereof, and, at the same time, hold the purchasers at the sale trustees for her, and also avail of all the profits made by them. Yet this would seem to be, practically, the position, here, of the complainant. There is every reason to believe, from the evidence, that but for money the complainant derived in consequence of the arrangement, now objected to, between Rhodes and Dobbins, she would have been unable to have relieved her Washington property from the lien then hanging over it, and for which property she has since received, by sale, $30,000; and, by her delay in disaffirming the sale, the purchasers have lost opportunities of making other investments that could have been made, equally advantageous to themselves, as the investment in this property is proven to have been—the evidence being clear that at the

time, and for some time after Dobbins purchased, there were abundant opportunities for investments in other real estate, in and about Chicago, as inviting, and which have since proved as profitable as this purchase of the Douglas property.

Under all the circumstances, we think complainant's delay to make her election unreasonable. Her *laches* is such as renders it inequitable that she should now have the decree she prays.

The objection that the specific defense of *laches* is not interposed by the answer, is obviated by the attempt made by the allegations of the bill to excuse complainant's delay in bringing her suit. *Hall et al.* v. *Fullerton,* 69 Ill. 448.

The decree is affirmed.

*Decree affirmed.*

Mr. Justice Dickey: As to the supposed *laches* of appellant, it seems to me that the question is not raised by the pleadings. Appellees do not set that up as a defense, and appellant, under the pleadings, was not called upon to explain or excuse the supposed delay, nor to rebut the inferences which (were that question in issue) may seem to arise from the proofs, and, strictly, she has had no opportunity to do so. The issue was, whether Rhodes, in fact, was a co-purchaser at his own sale. The case of *Hall et al.* v. *Fullerton,* to my mind, is not in point. The proofs are with complainant on that question, and it seems to me she is, on this record, entitled to the relief sought.