LAURA REEDY et al.

v.

JOHN MILLIZEN et al.

*Filed at Springfield January 14, 1895—Rehearing denied June 10, 1895.*

1. EVIDENCE—*presumption of death from seven years' absence.* The presumption of death from seven years' unexplained absence does not, by law, arise until the full period elapses, and the presumption of life will continue to the end of the seven years, unless facts are proved which show the absent party probably died sooner.

2. SAME—*presumption that life continued seven years yields to proof.* All the conditions by which the presumption of life for seven years may be affected, such as health, age, habits, disposition, pecuniary circumstances, family relations, etc., may properly be considered in determining whether the life of the absent party continued the entire seven years or terminated sooner.

3. SAME—*case where presumption of life for seven years prevails.* A man suddenly disappearing, under the age of fifty years, whose prospect of life was good notwithstanding a slight ailment, who had no children and whose relations with his wife were not cordial, who was being harassed by creditors he could not pay, who had said he was "going to leave the country," and who, there was slight evidence, was seen in another State five or six years after his disappearance, will be taken to have lived the full seven years.

4. LIMITATIONS—*statute beginning to run against ancestor bars minor heirs.* Where the seven years statute of limitations begins, within the seven years' presumption of life, to run against an ancestor so disappearing, it will continue to run and become a bar against his heirs, although such heirs are minors.

5. TRUST DEED—*notice of sale under—statement of amount due.* A notice of sale of land under a trust deed, which gives date, amount and rate of interest of note secured, and states that the holder has elected to declare the note "due and payable, with all interest thereon," substantially complies with the statute requiring the amount of the indebtedness to be stated in the notice.

6. INNOCENT PURCHASER—*grantee of purchaser at trustee's sale protected.* The grantee, for value, of a *bona fide* purchaser of land at a trustee's sale, who remains continuously in peaceable possession of the premises for many years, is not affected by irregularities and defects in the notice of sale.

7. AMENDMENT—*of record at subsequent term—new issue.* The rule that a record may be amended at a subsequent term to make it show what was actually done at the trial, does not permit an

amendment raising a new issue not presented by the pleadings at the trial.

8. APPEALS AND ERRORS—*confirmation of master's findings conclusive, in the absence of exceptions.* A court of review will not disturb a decree confirming a finding by the master that complainants are barred by *laches*, even though the defense of *laches* was not set up in the answer, where no exception was urged below to the master's finding upon that ground.

APPEAL from the Circuit Court of Moultrie county; the Hon. EDWARD P. VAIL, Judge, presiding.

J. F. HUGHES, R. M. PEADRO, and F. M. HARBAUGH, for appellants.

JOHN R. & WALTER EDEN, for appellees.

Per CURIAM: This is a bill to redeem from a sale and deed by a trustee, made April 29, 1878, under a trust deed executed by one Ira A. A. W. Camfield, dated March 1, 1875, and to set aside a subsequent conveyance by the purchaser at such sale to appellee Millizen. Appellants claim as heirs-at-law of Camfield, who is conceded to have been the owner of the land in controversy. The bill was filed less than three years after appellants attained their majority, so that the Statute of Limitations would not run against them unless it had commenced to run during the lifetime of said Camfield, under whom they claimed title.

If the Statute of Limitations had begun to run during the life of the ancestor, Camfield, it is too familiar to require the citation of authority, that his death, and the descent to his minor heirs of his rights and equities in the land, would not interrupt the completion of the bar, and that a court of equity will, in obedience to the statute, and, by analogy, to proceedings at law, give effect to the limitation. This is conceded, practically, and to avoid the effect it is contended that Camfield died prior to the sale and deed by the trustee, April 29, 1878, or, at least, prior to the subsequent conveyance to appellee

Millizen. His death is not shown, but it is insisted that, he having been absent and not heard from for seven years, the presumption of life is overcome, and there being, in such case, no presumption as to what time, within the seven years, death occurred, (*Johnson* v. *Johnson*, 114 Ill. 611,) the facts shown were sufficient to raise the presumption of fact that he died before the said conveyances, respectively,—that is, that Camfield having been so long absent without having been heard of or from that the presumption of his death arose, the facts shown raised the further presumption that the death occurred on or about January 1, 1878, and prior to the making of said trustee's sale and deed, and that, the title of Camfield having devolved by descent upon appellants, and they being under disability, the statute did not commence to run.

The rule is well established that absence for seven years without the whereabouts being known, and without having been heard from during that period, raises, at the expiration of that time, the presumption of death. (*Whiting* v. *Nicoll*, 46 Ill. 230; *Johnson* v. *Johnson*, *supra;* Lawson on Presumptive Evidence, rule 43, and cases cited.) When, however, a thing is shown to exist, its continuance is presumed until the contrary is shown or a conflicting presumption arises. Hence, unless it be shown that death occurred prior to the expiration of the seven years' absence, or some conflicting presumption arises from the facts proved which would overcome the presumption of the continuance of life, the presumption of life would obtain until the full expiration of the period, when the contrary presumption of death, from the continued absence, would arise. While, therefore, it is true that there is no presumption that death occurred at any particular time within the seven years, it is also true that, in the absence of contravening facts or controlling presumptions, it will be presumed that life continued during the entire period. *Clark* v. *Camfield*, 15 N. J. Eq.

119; *Montgomery* v. *Bevan*, 1 Sawy. 660; *Burr* v. *Lion*, 4 Whart. 150; *Eagle's case*, 3 Abb. Pr. 218; *Hancock* v. *Am. Life Ins. Co.* 62 Mo. 26; *Dean* v. *Bittinger*, id. 101; *Hopewell* v. *DePinney*, 2 Camp. 113; *Whiteside's Appeal*, 23 Pa. St. 114.

The various courts found it necessary to establish an arbitrary period upon the expiration of which death would be presumed, and they have fixed a period of seven years, probably as analogous to and in harmony with the statute of 1 James I, chap. 11, sec. 2, and 19 Charles II, chap. 6, the former providing a like period where the wife might marry upon continued absence of the husband, and the latter to obviate the necessity of establishing the .death of *cestuis que vie* in certain cases. (Lawson on Presumptive Evidence, 202.) No discussion, however, will be necessary of the reasons for the establishment of the rule. At the expiration of seven years the presumption of death arises by law, so that the absentee is to be treated and accounted as dead, just as the common law regarded him as living until death was proved. In neither case is life or death actually proved, but he is accounted as living until, by reason of his absence, he is presumed to be dead; and, as a matter of right and of equity, the relations of parties affected by his life or death are to be determined by these technical presumptions.

It follows, necessarily, that the presumption of the continuance of life may be overcome by proof of facts and circumstances raising a contradictory presumption or by stronger conflicting presumptions, as, where the presumption of innocence conflicts with the presumption of life, in which the latter gives way and the presumption of innocence obtains. (*Johnson* v. *Johnson, supra.*) So if circumstances be shown which will be deemed sufficient to raise the presumption of death before the expiration of the seven years' absence or at any particular time within the seven years, the presumption of life will be overcome. Lawson, in his work on Presumptive Evi-

dence, in stating what circumstances, if proved, will overcome the presumption of the continuance of life, lays down the following rule: "That within that time he was in a desperate state of health." (Rule 49.) "That his habits, character, domestic relations or necessities would have made it certain that if alive within that period he would have returned to or communicated with his residence, home or domicil." (Rule 52.) Numerous others are given, but these alone are applicable. The subject is usually one of very considerable difficulty, but must be determined by a consideration of the facts proved and the natural and legitimate inferences arising therefrom. The condition of health of a party when last seen or heard from always becomes an important subject of inquiry. If the party is afflicted with some disease liable to immediately produce death, or some specific malady which would necessarily undermine and destroy health and life, the presumption of an early dissolution would be greatly increased. So the age, habits of life, habits as to the use of stimulants or drugs, and, indeed, any conditions from which a presumption as to the continuance or destruction of life would arise, are proper to be considered. So, also, where one has lived an upright life and enjoyed the confidence of his acquaintances, is successful in business, attached to his family, contented, and fond of the associations of home, it is to be fairly presumed that if alive he would speedily return, or at least communicate with the objects of his affection. On the other hand, if his relations with his family were strained, if he was in straightened circumstances, unhappy, and discontented with his surroundings and associations, the likelihood of his return or communication would naturally be much lessened. The natural inference arising in one case would be opposed to that arising in the other, and as proof of one would tend to overcome the presumption of life, so proof of the other might, to a greater or less degree, when considered in connection

with the traits of character and habits of the particular
person, tend to strengthen that presumption, or at least
fail to create a contrary presumption.   *Webster* v. *Berch-
more*, 13 Ves. 362 ; *In re Hall*, 1 Wall. 85 ; *Tisale* v. *Connec-
ticut Mutual Ins. Co.* 26 Iowa, 170, and authorities *supra*.

We are unable to say, as the trial court was unable to
find, that the facts proved overcame, or, indeed, tended
to rebut, the presumption of the continuance of the ances-
tor's life.   No extended analysis of the evidence will be
necessary.

It appears that about September 19, 1877, Camfield,
who had been a farmer and some time before that date had
moved into the town of Sullivan, left his home and family
with the avowed purpose of going to Shelbyville, not far
distant, to try certain baths reported to be in operation
there, to be relieved of ailments of which he complained.
In respect of his physical condition then there is some
conflict in the evidence.   The weight of evidence, when
the means of knowledge of the various witnesses is con-
sidered, is that he was suffering from slight dyspepsia,
and his prospect of health and continued life was such as
is usual in that class of afflictions.   One of the physicians
testified: "There was nothing in his appearance that indi-
cated early or speedy death, and his prospect of life was
ten or fifteen years." It appears, with reasonable cer-
tainty, that he had been twice poisoned with strychnine,
the occasions being some years apart, on both of which
he was attended by Dr. Marshall,—the last occurrence
being a month or two before he left home.   This latter
physician saw nothing in Camfield's condition that would
indicate that with proper treatment he would not live a
number of years.   The proof, while perhaps creating some
grave suspicions that the poison had been administered
to him, does not satisfactorily show how or why he was
poisoned.   It would seem that all of the evidence tending
to show that he was in bad health could readily be attrib-
uted to his dyspeptic condition, aggravated, it may be, by

his recent poisoning, but from the effects of which he had apparently recovered. A day or two after his departure from home he wrote four letters from Shelbyville: one to his wife, one to his son-in-law, Fultz, one to Conrad, his tenant, and one to a neighbor. That to Fultz is the only one preserved and in evidence. It states that the writer is as well as could be expected, wishes the children of Fultz good health, sends love to all inquiring, and directs Fultz to "tell the people generally that they may look for me Friday or Saturday, sure, if nothing prevents me." It is possible that the suggestion to tell the people generally they may look for him by Friday or Saturday sure, may have some slight significance, in view of the fact that Camfield was very considerably involved in debt, that he was unable to pay accruing interest and taxes, that creditors were harassing him, that the sheriff then had various summonses against him, that a constable had sold some of his household effects on execution, and that he had expressed a determination to leave the country. He had no children, and for years had been living with his second wife, between whom and himself the relations were, at times, at least not pleasant. He had intimated to the witness Conrad that he was afraid of his wife. It would therefore seem that there was but little to detain him at his home. He had no children living, the relations with his wife were not cordial, he was badly embarrassed financially, and was anxious to regain his health. He was apparently insolvent, and discouraged with his surroundings, and it can not be said that his circumstances were such as to raise an inference that he would be likely to return and take up the struggle against the adversities which seemed to surround him.

There is another circumstance that may be alluded to. The witness Monroe, who had been acquainted with Camfield from childhood, testifies that some five or six years after the disappearance of Camfield he saw him near Galena, in south-eastern Kansas. His testimony is

entitled to no considerable weight, owing to the peculiar
circumstances under which the witness claimed to have
seen Camfield, but when taken in connection with the
testimony of the witness Conrad that Camfield said he
was going to Shelbyville, but that he was also going to
leave the country and didn't know that he would ever
return, as well as with the other circumstances of the
case, it is not improbable. The most that was done to
find Camfield was to inquire of friends in Texas, Cali-
fornia and Kentucky. No other search for him, dead or
alive, seems to have been made. No effort is made to
impeach the credit or character of any of the witnesses.
Had Camfield died at Shelbyville, or soon after his de-
parture from home, it would seem unreasonable that the
fact did not become known.

In view of these facts, taken in connection with the
testimony of the physicians who treated him, in regard
to his malady and probability of the continuance of life,
and the further fact that he was then less than fifty years
of age, we are unable to say that the presumption of the
continuance of life has been overcome. The circum-
stances proved not only do not show probability of his
death within the period of seven years after his depart-
ure, but, as we think, tend to support the presumption
of life.

It is next insisted by counsel for appellants that the
sale under the trust deed was void for the reason that
the notice of such sale was insufficient, in that the amount
claimed to be due on the indebtedness was not stated, as
required by statute, (Rev. Stat. sec. 14, chap. 95,) and
*Equitable Trust Co.* v. *Fisher*, 106 Ill. 189, is relied upon as
sustaining this position. An examination of that case
will show that it was not decided upon that ground, nor
was the question there expressly urged and discussed.
The learned justice who wrote the opinion, in passing
upon the conduct of the trustee in disparaging the title,
incidentally remarked, "nor did he state in the notice the

amount claimed to be due on the indebtedness, as is explicitly required by the statute," and then proceeded: "Why this effort to depreciate the price of the property, unless it was to accomplish an unfair purpose?" etc. Had the learned justice there attempted to dwell upon the point here presented, he would have found the holdings generally to be, that where such a statement in the notice is required by the terms of the trust or by the statute, the amount claimed to be due need only be stated with substantial accuracy. If, from the notice, the amount due or claimed to be due can be ascertained with reasonable certainty, it will suffice. Substantial compliance with the statute would seem to be all that is required. (2 Perry on Trusts, sec. 602; *Burnett* v. *Denniston,* 5 Johns. Ch. 35; *John* v. *Turner,* 7 Ohio, 216.) The question, however, is placed at rest by the decision of this court in the later case of *Hoyt* v. *Pawtucket Institution for Savings,* 110 Ill. 390, where the question was directly insisted upon and expressly decided. The notice there stated the principal sum and rate of interest, and that default had been made in the payment of part of one interest coupon note due November 22, 1876, and the whole of another due May 22, 1877, and that the holder of the indebtedness had elected to exercise his option to declare the whole amount due. No one could doubt that these interest coupon notes were for $250 each, and the slightest inquiry and calculation would give an interested party the exact amount due. It was there said: "We think it appears from the notice, with reasonable certainty, that the amount claimed to be due is the principal sum, the interest note due May 22, 1877, and part of the interest note due November 22, 1876. There is an indefiniteness in the latter respect in stating as to what part of the interest note due November 22, 1876, there has been default of payment; but considering the amounts involved,—the smallness of the interest note compared

with the principal sum,—we think the notice in this respect may be said to state substantially the amount due."

In the case before us even the "indefiniteness" adverted to in the language just quoted does not exist. The notice given March 26, 1878, sets out the amount of the principal note, $1200, dated March 1, 1875, due in five years from that date, with interest thereon at ten per cent per annum, payable semi-annually, on March 1 and September 1 of each year. "And whereas, default has been made in the payment of interest due on said note; and whereas, the said Camfield has suffered the said premises to be sold for taxes, * * * and the legal holder of said note have elected to declare the same due and payable, with all interest thereon: * * * Now, therefore, I, the undersigned, as such trustee, do hereby give notice that, under and by virtue of the power conferred on me by said trust deed, I shall, on the 29th day of April, A. D. 1878, at ten (10) o'clock A. M., at the door of the court house in Sullivan, Moultrie county, Illinois, sell at auction, to the highest bidder, for cash, * * * to pay and satisfy said promissory note, with all interest thereon, and all costs of said sale." The fact was that Camfield had paid no part of interest or principal, and it is obvious that this notice recited the truth when it stated the holder elected to "declare the same due and payable, with all interest thereon," and no one need have been misled as to the amount actually due. It could have been easily calculated from the notice. Moreover, the property was subsequently sold and conveyed by the purchaser at such sale to appellee Millizen for $1200, who was, as we view the evidence, a *bona fide* purchaser, and had been continuously in the peaceable possession and enjoyment of the premises for many years prior to the bringing of this bill. It is therefore clear that he could not be affected by irregularities and defects in the notice, if it be conceded any such existed, as alleged. (*Bush* v. *Sherman*, 80 Ill. 160; *Fairman* v. *Peck*, 87 id. 156;

*Gunnell* v. *Cockerill,* 79 id. 79; *Hamilton* v. *Lubukee,* 51 id.
415.)  But, in our opinion, the evidence shows the sale
to have been had and conducted, in all respects, in sub-
stantial compliance with the requirements of the statute
as provided in such cases.

In this case, after the decree had been entered, the
court adjourned for the term and an appeal perfected to
this court, appellees, in vacation, sought and obtained
an order from the trial judge permitting the defendant
Millizen to file an amendment to his answer, setting up
therein the defense of *laches* on the part of said Camfield.
A copy of said amendment, the affidavit and notice upon
which the same was allowed, together with a copy of
the order of the trial judge, in vacation, allowing the
amendment, are filed in this court, with a suggestion of
diminution of the record.   A motion was made by appel-
lants to strike said suggestion, so far as it applies to
amendment of the answer, and the order allowing it,
from the files, the parties having filed a stipulation in
this court that certain matters, clearly shown to have
been inadvertently omitted from the record, might be
considered in the record as fully and to the same extent
as though they had been duly incorporated therein.   In
respect to this latter matter of stipulation no question
of practice, or the propriety of it, is raised.   But the
motion, which was reserved for the hearing, to strike
said suggestion from the files must be sustained.   The
transcript of the record was made up and certified by the
clerk of the circuit court June 4, 1892, and assignments
of error made thereon and filed with the clerk of this
court June 6, 1892.  It appears that the order allowing the
amendment to the answer was also filed June 6, 1892, with
the clerk of the circuit court.   It is therefore reasonable
to presume that the order allowing the amendment was
not filed, and did not become a part, if at all, of the rec-
ord, until after the appeal to this court had been per-
fected.   Such order was clearly erroneous.  (*Illinois Land*

*and Loan Co.* v. *McCormick,* 61 Ill. 322.) It has been held
by this court in various cases, that upon bringing the
parties again into court, amendment of the record may
be had at a term subsequent to that at which the final
judgment or decree was entered, for the purpose of cor-
recting, or supplying omissions from, the record, and to
make it truly show what actually transpired at the trial
or that which should have been entered of record. (*Chi-
cago, Milwaukee and St. Paul Railway Co.* v. *Walsh,* 150 Ill.
607; *Wisconsin Central Railroad Co.* v. *Wieczorek,* 151 id. 579.)
But the right to thus amend has never been extended so
as to allow a party to alter and amend his pleading by
presenting a new issue,—one not made by the pleadings
on the trial. A rule allowing procedure of this character
would make litigation almost interminable, and it would
be a great hardship to require a party to try a cause
upon the issues presented by the pleadings, and after-
ward, on appeal, be required to meet other and distinct
matters of controversy. The defense of *laches,* which
should always be pleaded when relied upon, (*Zeigler* v.
*Hughes,* 55 Ill. 288,) except where the defense has been
anticipated and excuse therefor set up in the bill, (*Wil-
liams* v. *Rhodes,* 81 Ill. 571,) was not, as to complainants
or said Camfield, set up in either of the separate answers
of appellees, and it would, indeed, be a bad precedent to
now permit it to be done. Inasmuch as we must consider
the case upon the original record, the error, manifestly,
is one not commanding a reversal.

Appellants, however, in their bill allege their minor-
ity; that they did not arrive at the age of eighteen years,
respectively, until October 15, 1889, and October 21, 1891,
and that immediately upon becoming apprised of their
alleged rights in the premises they sought to redeem the
land from the trustee's sale aforesaid, but were not per-
mitted to do so by appellees. It is true that time does
not, in equity, run against a minor, and that *laches* would
not be imputable to appellants during their disability of

infancy. (*Walker* v. *Ray*, 111 Ill. 315; *Ryder* v. *Emrich*, 104 id. 470.) But the master found that if said Ira A. A. W. Camfield be presumed to have been alive seven years from the time he went away, as we have found the law to be, he was therefore alive six and one-half years from the date of sale, made April 29, 1878, and that it was incumbent upon him to undertake to defeat said sale within a reasonable time, which he did not do. It is shown that appellee John Millizen had been in the actual, peaceable possession of the premises under deed from the purchaser at said trustee's sale, and had paid all taxes and assessments against the land from that time, (February 4, 1882,) for more than seven successive years. It is therefore clear, even conceding, for the sake of the question, that his title might be affected by knowledge of the alleged defects in the sale, that *laches* was imputable to Camfield, and that after the lapse of more than six years from the time he went away or was last heard of, (at Shelbyville, September 20, 1877,) until the end of the seven years from that date during which he was deemed to be alive, a court of equity would be justified in withholding its aid, as equity will not assist him who has not been reasonably diligent in the assertion of his rights. (*Lequatte* v. *Drury*, 101 Ill. 77; *Breit* v. *Yeaton*, id. 242.) To this finding of the master complainants made no exception on the ground that the defense of *laches* was not set up in the answers, and we are not at liberty to disturb the ruling of the court confirming that finding. Furthermore, appellee Millizen, under his deed from co-appellee, Elder, purchaser at said trustee's sale, was in the continuous, actual and peaceable possession of the land in question, and paid all taxes and assessments levied thereon, for more than seven successive years. That he was a *bona fide* purchaser for value seems beyond question. That he bought the land for $1200, being some sixty odd dollars less than his co-appellee, Elder, paid for it at the sale, is not material, in the absence of any evidence showing

want of good faith. The value of the land at that time was testified to by numerous witnesses on both sides, and discrepancies exist in their estimates, as is usual in such cases, but we are not prepared to say that the finding of the master was not correct. And even if we were, it is too familiar to require the citation of authority that mere inadequacy of consideration is not, of itself, evidence of fraud, unless it be so grossly inadequate as to raise the inference of fraud. Such is not the case here. Ample evidence is to be found in the record to show that Millizen paid a fair price, at that time, for the land, and to justify the finding of the master.

Appellee Millizen having been in the actual possession of the land in question under claim and color of title made in good faith, and having for seven successive years and more continued in such possession, and during all that time paid all taxes legally assessed against the land, the bar of the statute became complete. (Rev. Stat. sec. 6, chap. 83.) And said Camfield being under no disability when the statute commenced to run, and nothing having been shown to arrest the operation of the statute, the same continued to run, (*Bonney* v. *Stoughton*, 122 Ill. 536,) and became a bar to any and all rights of said Camfield in the premises, as alleged in the bill, and to the action of the said complainants therein claiming under him.

Other questions are presented not deemed of sufficient importance to warrant consideration here. They have been examined, and are met by what has been said.

The decree of the circuit court will be affirmed.

*Decree affirmed.*